

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE MAY 1 6 2019

Fairhurst, CJ.

CHIEF JUSTICE

This opinion was
filed for record
at 8am on May 16, 2019

for Susan L. Carlson
Deputy
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | NO. 95905-6 |
| Petitioner, | |
| v. | EN BANC |
| LEONEL ROMERO-OCHOA, | Filed ___MAY 1 6 2019___ |
| Respondent. | |

STEPHENS, J.—A jury convicted Leonel Romero-Ochoa of burglary, unlawful imprisonment, assault, and multiple counts of rape, arising from an incident in which he broke into a woman's home, beat her, and raped her twice. At trial, Romero-Ochoa sought to admit evidence that the victim had applied for a U visa in connection with these crimes. A U visa grants temporary legal resident status to a person who is the victim of a qualifying crime and who helps law enforcement investigate or prosecute that crime. The trial court excluded the U visa evidence.

Romero-Ochoa appealed his convictions on the ground that exclusion of the U visa evidence violated his state and federal constitutional rights to present a defense and to confront witnesses. WASH. CONST. art. I, § 22; U.S. CONST. amend. VI. Division Two of the Court of Appeals agreed. It reversed all but the unlawful imprisonment conviction, holding the constitutional error was harmless beyond a reasonable doubt as to that conviction but not as to the others, because "[a]lthough the State's evidence against [Romero-]Ochoa was strong, its strength depended entirely on the jury finding [the victim]'s testimony credible." *State v. Romero-Ochoa*, No. 48454-4-II, slip op. at 1, 8, 15 (Wash. Ct. App. Dec. 28, 2017) (unpublished), http://www.courts.wa.gov/opinions/pdf/D2%2048454-4-II%20Un-published%20Opinion.PDF.

We granted the State's petition for review, which raised only the harmless error issue. *State v. Romero-Ochoa*, 191 Wn.2d 1005 (2018). On that issue, we now reverse the Court of Appeals and hold that any error in excluding the U visa evidence was harmless as to all of Romero-Ochoa's convictions. We therefore reinstate the convictions for rape, burglary, and assault and remand for the Court of Appeals to consider the claim of sentencing error it did not reach before.[1]

---

[1] *See Romero-Ochoa*, No. 48454-4-II, slip op. at 1-2.

## FACTS

The State charged Romero-Ochoa with burglary, kidnapping, and multiple counts of rape, arising from an incident in which he climbed through the victim's bedroom window and repeatedly beat and raped her.

Before trial, the State moved to exclude any reference to the immigration status of the victim, any witness, or the defendant. The defense sought to introduce evidence that the victim had twice applied for a U visa, once relating to an assault by her ex-husband and once relating to the events giving rise to this case. According to defense counsel, the prior U visa application had not been approved. The second application was on hold, pending certification from local law enforcement that the victim "ha[d] been cooperative with authorities." 3 Verbatim Report of Proceedings (VRP) (Oct. 14, 2015) at 94. According to the deputy prosecutor, this certification could come either from her office or from the police, but her office maintained a policy not to consider any application while a case was still pending. It was undisputed that the victim sought this certification from the prosecutor's office. It was also undisputed that the prosecutor told her the office would not consider the merits of U visa certification while a criminal case was still pending, but that the victim could resubmit her request when the case was closed.

The trial court initially excluded only evidence of the prior U visa application, provided such evidence did not become necessary to impeach the victim regarding when she became aware of the U visa program. It also permitted the defense, over the State's objection, to question the potential jurors about their attitudes regarding immigration. The court specifically noted that it was allowing this line of questioning because it was appropriate to explore potential jurors' attitudes about race or national origin at a trial where a Latino defendant would be testifying in Spanish using an interpreter.[2] Several days later and after consulting additional authority, the trial court excluded any evidence of the current U visa application. It explained:

> I think once you start bringing in the issue of immigration status, it becomes a very slippery slope. And given the emotional reactions one way or another, which we saw during voir dire . . . .
> I just am concerned about the inflammatory effect of that kind of evidence, and I'm going to exclude any evidence of the U visa or anything else about immigration of either parties, any of the witnesses. And that's my ruling.

5 VRP (Oct. 19, 2015) at 28. Acknowledging the lack of Washington case law on point and the existence of out-of-state authority contrary to its ruling, the court

---

[2] At trial, Romero-Ochoa took the stand and testified in Spanish, using an interpreter. There was also some testimony about the use of Spanish-speaking law enforcement and medical personnel to interview the victim and other bilingual witnesses, but no other witness testified using an interpreter.

-4-

clarified that it was finding the U visa application relevant but that its "probative value is overwhelmed by the prejudicial effect." *Id.* at 32.

At trial, the State presented testimony from 19 different witnesses; Romero-Ochoa was the only witness for the defense. The victim described the events at issue as involving two separate acts of stranger rape in the context of a horrific home invasion; in contrast, Romero-Ochoa described the events as consensual sex in the context of a secret affair spanning years. The jury returned guilty verdicts on two counts of first degree rape, two counts of second degree rape, one count of first degree burglary, one count of unlawful imprisonment, and one count of second degree assault. By special verdicts, the jury found that Romero-Ochoa committed the burglary and assault with a sexual motivation; that he restrained the victim by physical force, intimidation, or deception; and that he committed second degree assault by strangulation.

Romero-Ochoa appealed his conviction on the ground that, by excluding the U visa evidence, the trial court violated his constitutional rights to confront adverse witnesses and to present a defense. Division Two agreed that the trial court committed constitutional error, and it reversed on every count except unlawful imprisonment. *Romero-Ochoa*, No. 48454-4-II, slip op. at 1. As to that count, the Court of Appeals found the trial court's error harmless. *Id.* The distinction it drew

was based on the fact that a neighbor saw Romero-Ochoa grab the victim by the hair and drag her back into her home, supporting the unlawful imprisonment conviction, but no third party visually witnessed the burglary, assault, or rapes inside the victim's home. *Id.* at 15-16. According to the Court of Appeals, this meant that proof of the burglary, assault, and rapes turned entirely on the victim's credibility. *Id.* The Court of Appeals reversed and remanded for a new trial on all but the unlawful imprisonment charge. *Id.* at 16. As noted above, the court did not reach Romero-Ochoa's claim of sentencing error. *Id.* at 16-17.

The State filed a motion for reconsideration, which Division Two denied, and then petitioned this court for review. The State did not challenge the Court of Appeals' holding on the admissibility of the U visa evidence. Instead, it argued only that this court should overturn the Court of Appeals' holding on harmless error because it erroneously implied an eyewitness corroboration requirement in conflict with well-settled precedent. We granted review.

## ANALYSIS

Both the state and federal constitutions guarantee a criminal defendant the right to present a defense and to confront adverse witnesses at trial, but violations of those rights are subject to constitutional harmless error review. *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986); *State v. Lui*,

179 Wn.2d 457, 495, 315 P.3d 493 (2014); *State v. Jones*, 168 Wn.2d 713, 724, 230 P.3d 576 (2010). An error is harmless and not grounds for reversal if the appellate court is assured beyond a reasonable doubt that the jury would have reached the same verdict without the error. *Lui*, 179 Wn.2d at 495; *Jones*, 168 Wn.2d at 724; *Van Arsdall*, 475 U.S. at 684.

In the context of an erroneous exclusion of impeachment evidence, "[t]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, [we can] nonetheless say that the error was harmless beyond a reasonable doubt." *Van Arsdall*, 475 U.S. at 684. Consistent with our overwhelming untainted evidence test, this inquiry requires us to find the error harmless if, in light of the entire trial record, we are convinced that the jury would have reached the same verdict absent the error.[3] Relevant considerations include the properly admitted direct and circumstantial evidence (i.e., the strength of the State's case and the plausibility of the defense theory) and the overall

---

[3] *Compare State v. Guloy*, 104 Wn.2d 412, 426, 705 P.2d 1182 (1985) ("The 'overwhelming untainted evidence' test allows the appellate court to avoid reversal on . . . technical . . . grounds while insuring that a conviction will be reversed where there is any reasonable possibility that the use of inadmissible evidence was necessary to reach a guilty verdict."), *with Van Arsdall*, 475 U.S. at 681 ("we have repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt").

significance of the erroneously admitted or excluded evidence in this context (e.g., whether it was cumulative or corroborated, or consistent with the defense theory). *Van Arsdall*, 475 U.S. at 684 (where trial court erroneously excluded impeachment evidence in violation of confrontation clause protections, factors relevant to the harmless error analysis "include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case"); *Lui*, 179 Wn.2d at 496-97 (erroneous admission of autopsy report harmless in light of properly admitted forensic, motive, and other circumstantial evidence, and the fact that defendant's testimony was contradicted by other witnesses and DNA (deoxyribonucleic acid) evidence); *State v. Hieb*, 107 Wn.2d 97, 110-12, 727 P.2d 239 (1986) (erroneous admission of hearsay harmless where "overwhelming circumstantial evidence" supported State's theory and defendant's theory was incompatible with physical evidence); *State v. Guloy*, 104 Wn.2d 412, 426, 705 P.2d 1182 (1985) (erroneous admission of hearsay harmless in light of "the overwhelming amount and credibility of the properly admitted evidence").

Harmless error review requires close scrutiny of all the evidence. As detailed below, 13 separate witnesses corroborated the victim's account of her attack. These witnesses included neighbors who heard the attack and witnessed the victim trying to escape, first responders who saw the victim run out of her house half naked and crying, detectives and technicians who gathered crime scene and forensic evidence, and medical personnel who treated the victim and documented her injuries and physiological indicators of stress. The only witness for the defense was Romero-Ochoa, who admitted to sexual intercourse with the victim but said it was consensual, the result of a chance encounter with a former secret lover. The victim's sister took the stand to rebut numerous aspects of Romero-Ochoa's story.

The victim testified at trial and gave the following account of the attack:

By July 3, 2014, the victim and her daughter had lived in unit A at the San Francisco Avenue trailer home park for three or four years. Before she and her daughter went to sleep that night, the victim closed all the windows in their home, including the window, which did not lock, in the room where she and her daughter slept. The victim woke up at about 3 a.m. to find a strange man (whom she identified at trial as Romero-Ochoa) standing over her bed; when she asked him who he was, he said, "Just be quiet. Don't say anything." 6 VRP (Oct. 20, 2015) at 9. At that point, the victim stood up and ran into her living room, where Romero-Ochoa

grabbed her by the hair, pulled her over to the couch, and pressed his hands on her mouth and neck so that she could barely speak. He climbed on top of her, started taking off his pants, and took off her shorts and underwear. She told him to leave her alone and he told her to be quiet. He kissed her neck and legs for about 2 minutes, telling her, "'I like you'" and "'I'm doing this to you because I like you,'" and then raped her for about 20 minutes. *Id.* at 12. During the rape, the victim was crying and screaming, and Romero-Ochoa repeatedly hit her in the face, covered her mouth, and told her to be quiet.

At some point while she was still being raped, the victim told herself to calm down and think of an escape plan. Because Romero-Ochoa smelled strongly of alcohol and appeared to her to be drunk, she thought she might be able to distract him by offering him a beer. She asked him if he would like a beer, he said yes, and she told him he could get it out of the refrigerator. He told her that she would get it for him and then grabbed her by the hair and pulled her toward the refrigerator. After the victim took a beer from the refrigerator, Romero-Ochoa grabbed it with both hands, and she was able to run out of the house, taking a small blanket with her. She ran about 10 meters to the house across from hers and banged on the windows, but nobody answered. Romero-Ochoa chased her, grabbed her by the hair, and hit her twice in the face. Romero-Ochoa threw her on the ground and dragged her about

2 meters back to her house. Back inside the house, Romero-Ochoa threw her back on the sofa and raped her again for 20 to 25 minutes, covering her mouth. This time, the victim was crying but not screaming or saying anything because she was scared he would kill her. Romero-Ochoa stopped raping her when someone knocked on the door. He began to get dressed, holding the victim by the hand "really, really hard" until he needed to put on his shoes. *Id.* at 20. At that point she was able to get away from him and she ran out the front door.

Once outside, the victim ran to her neighbor, Elizabeth Guillen, who was standing across from the victim's house, and told her that her daughter was still inside. About 5 minutes later, after the police had arrested Romero-Ochoa and Guillen had retrieved the victim's daughter from inside the house, officers interviewed the victim and asked her if she knew her attacker. She told them she did not know his name, but that when he threw her down on the couch and she got a clear look at his face, she remembered that she had seen him before.

The victim recalled that she had met Romero-Ochoa once before the attack, at a birthday party that she and her former partner had thrown for their daughter in November 2011. Romero-Ochoa and his brother had arrived, uninvited, and stayed about 20 minutes. Romero-Ochoa had asked the victim what her name was and she told him, but otherwise they did not interact. Since then she had occasionally seen

him driving or at the store, but had never again spoken with him. She did not learn his name until after he attacked her.

About 10 minutes after she gave her statement to police, an ambulance arrived and took the victim to the hospital. The doctors and nurses at the hospital examined the victim at about noon that day, by which time her entire body hurt. Her lips and mouth had scratches; her neck, hands, and legs were bruised and hurt; and her vagina was burning. She could not stop crying.

The following testimony from other witnesses corroborated the victim's account:

Officers Ryan Moody and Maxwell Criss of the Lakewood Police Department were dispatched to a disturbance at a trailer home park on San Francisco Avenue at about 4:30 a.m. on July 4, 2014, where they eventually encountered Romero-Ochoa. After talking with a reporting party and two other residents, the officers began investigating residence A and found that one of the windows was open. The officers could hear noises from inside but could not tell what they were; they knocked and received no response. Finally, after talking again with a reporting party, the officers were preparing to force entry when the front door suddenly "flew open" and a woman with a "look of frantic fear" on her face ran out, her bottom half naked. 5 VRP (Oct. 19, 2015) at 58-59. Through the now-open door, the officers saw

Romero-Ochoa standing inside the home, without any pants on, appearing shaky and unsteady on his feet, with a "glazed-over look in his eyes." *Id.* at 59. The officers arrested Romero-Ochoa and cleared the residence, finding no one else inside except a small child sleeping in a bedroom. Afterward, they spoke briefly with the woman who fled. She had red marks on her face and neck and was distraught and crying. She told Officer Criss that she awoke to Romero-Ochoa standing over the bed where she was sleeping with her daughter, that she yelled at him to get out, and that he then grabbed her by the hair and forced her into the living room where he slapped her face, choked her, and raped her. The victim told Officer Criss that the defendant covered her mouth while he was raping her so she could not scream. She also said that she had seen her attacker around the trailer park but did not know his name.

Detective Darin Sale of the Lakewood Police Department testified that on the morning of July 4, 2014, police collected pink shorts, undergarments, and an unopened beer bottle from the victim's living room, and a sock and a man's undergarment from her front porch.

Guillen (the neighbor) woke up at 3 or 4 a.m. that morning to what sounded like a fight coming from a neighbor's home. She heard two periods of screaming, about 5 or 10 minutes apart, which lasted only a couple of seconds each. She characterized the screams as "[k]ind of like a cry for help, or 'don't.'" *Id.* at 101.

After hearing the second scream, Guillen looked out her window and saw a "shadow" running up the stairs of the park manager's office. *Id.* at 102. She heard the shadowy figure yell for help in both English and Spanish, and then Guillen called 911. Guillen went outside where she saw more neighbors, told them that the screaming was coming from the victim's house, and also heard thumping and the sound of what appeared to be furniture being moved. Guillen was still standing outside when the victim ran out of her house with only a shirt or tank top on, yelling that her daughter was inside. Guillen grabbed the victim and hugged her for about 5 minutes. The victim was shaking and crying and yelling repeatedly, "'He came in through my window. He raped me.'" *Id.* at 105. When Romero-Ochoa came out of the victim's home shortly after that, he was calling to the victim in Spanish, saying something like, "my love, why are you doing this?" *Id.* at 105. He looked to Guillen like he was intoxicated or on drugs.

On the night of the 911 call, Guillen's husband, Rafael Guillen-Gonzalez, looked out his living room window and saw Romero-Ochoa pulling the victim by her hair with both hands and dragging her into her home. The victim was wearing only a tank top and was screaming and crying out for help. The lower half of her body was on the ground as Romero-Ochoa dragged her 15 feet across gravel, telling

her to be quiet. Guillen-Gonzalez told his wife to call the police and she did; the police arrived about 10 minutes later.

Abel Garcia, the manager at the trailer park where the victim lived, called 911 at about 4:30 a.m. on July 4, 2014, after he heard someone "asking for help and . . . kind of like screaming." 6 VRP (Oct. 20, 2015) at 98. He thought this person's mouth was being intermittently covered so they could not cry out. Right before he called 911, Garcia looked out his window and saw somebody on a neighbor's porch; he could not see who it was, but he told the dispatcher it sounded like "'a girl in trouble.'" *Id.* at 100. After he called 911, Garcia went outside and encountered another neighbor, and the two of them went to look for the source of the screaming. They determined the screaming, which sounded breathless, was coming from the victim's unit; they could also hear a male voice coming from that unit. Police officers arrived, spoke with two other neighbors (Guillen and Guillen-Gonzalez), and then approached the house; shortly thereafter, the victim ran out, "embarrassed because she was out of clothes." *Id.* at 104.

Officer Michelle Hector testified that she interviewed the victim at the hospital on the morning of July 4, 2014. Officer Hector recalled that the victim was crying, had red marks all over her face, and repeatedly stated that no one had come to help her. The victim recounted the attack for Officer Hector, telling her the same

details she had given to police. Later that afternoon, Officer Hector photographed the victim's injuries, including scratches on the victim's face and neck, red marks on her neck, and red marks and bruising on one or both of her legs.

Dr. Jaime Delcampo was the emergency physician on duty when the victim was admitted to the hospital. He examined the victim that morning and noted that she was crying and extremely anxious, with a very elevated heart rate and bruising on the right side of her face, mostly along her jaw. He reexamined the victim regularly throughout his shift, which ended at 2 or 3 p.m., and observed that her bruising became worse as the day progressed, especially on her neck. Because visible bruising from strangulation is relatively rare, Dr. Delcampo was concerned about vascular and arterial injuries and ordered a CT (computed tomography) scan. He also noted that the victim had bruising on her left inner thigh and shin, had swelling in her left wrist, was complaining of pain in her neck, and had an elevated white blood cell count, which Dr. Delcampo attributed to a stress reaction. Dr. Delcampo tried to find a sexual assault nurse examiner (SANE) to do a genital examination and evidence collection, but none was available, so he performed that examination himself, assisted by a resident who spoke Spanish and a member of the hospital's nursing staff. Dr. Delcampo observed bleeding in the victim's vagina but no lacerations or bruising. The victim reported pain when he examined her vagina

and uterus. Dr. Delcampo testified that it was common for victims of sexual assault to report pain but uncommon for them to have any vaginal lacerations or bruising.

A forensic scientist from the Tacoma crime laboratory testified that DNA swabs from Romero-Ochoa's penis matched a DNA reference sample provided by the victim.

Mandy Graham, the ER (emergency room) nurse who participated in the victim's SANE exam, did a head to toe examination of the victim and noted bruising behind her left ear; multiple scratches to her face and neck; blue bruises on her upper left arm, right hand, and lower leg; a six-inch bruise on her left inner thigh; and scratches on her knees and knuckles. Graham was present with the victim for several hours throughout her shift and recalled that the victim remained very upset and tearful the whole day.

Finally, Sarah Hanley, the triage nurse on duty when the victim arrived at the ER on July 4, 2014, described her as "disheveled and . . . somewhat frantic[,] . . . tearful and anxious" and speaking so rapidly that Hanley could not make notes of what she was saying. 8 VRP (Oct. 22, 2015) at 26. Hanley did a preliminary assessment and noted red marks on the victim's neck. Hanley recognized the marks as the kind that would later develop into bruises. The victim told Hanley, "'He choked me.'" *Id.* at 28.

To undermine the State's case, Romero-Ochoa elicited the following on cross-examination:

The apartment manager, Garcia, acknowledged telling police that night that he had seen a male attempting to leave the victim's house through a window right before the officers arrived.

Officer Moody acknowledged that the young child at the victim's home was asleep when the officers found her and that he did not hear any loud noises between arriving on the scene and seeing the front door open.

Officer Hector acknowledged that she did not see any fingerprints or hand imprints on the victim's neck but also explained that such markings were rare in her experience with choking victims. She also acknowledged that she did not photograph the lower back part of the victim's body and did not recall the victim reporting any injuries to this area, even though the victim reported being dragged, unclothed, across the ground.

Dr. Delcampo acknowledged that the lack of visible injury to a patient's genitals could be consistent with either a sexual assault or consensual sex, but he also clarified that in his experience the majority of patients who underwent a SANE exam did not have visible injuries to their genitals or the surrounding area. He also acknowledged that the CT scan did not reveal any traumatic injuries to the victim's

neck but explained that neck pain can also be caused by minor soft tissue injuries, which do not register on a CT scan.

Romero-Ochoa was the only witness for the defense. He offered the following account:

Romero-Ochoa testified he first met the victim in 2008 and 2009, when he and his brother, Pascual, renovated a restaurant/butcher shop called El Compadre, which was managed by the victim's brother Leonel. The victim occasionally came to El Compadre to pick up meat for a restaurant called El Sabroso, which was managed by her other brother, Gil. In addition, both Romero-Ochoa and his former wife were socially connected with the victim's family: Romero-Ochoa was close friends with Leonel and well acquainted with Gil and had done remodeling work for both of the victim's sisters, Deici and Maria; Romero-Ochoa's former wife had sometimes cared for both Deici's and the victim's children, watching the victim's daughter once or twice a month.

Romero-Ochoa said that he and the victim began a secret sexual relationship in 2010, meeting at least twice a month at a hotel around 9, 10, or 11 p.m. Their affair ended in 2013 after she began to confide in him too much about the problems

she was having in her marriage[4] and his wife began to suspect something was going on.[5]

On July 3, 2014, Romero-Ochoa was living in Kent but went to visit Pascual at his home at the San Francisco Avenue trailer park. He left Pascual's house at around 2 a.m. on July 4 and began walking to a nearby gas station, where a friend was going to pick him up, when he noticed that the victim was standing at a window of her home. At this point, it had been about a year and a half since the two of them had ended their relationship and ceased all sexual intimacy, and it was random chance that the victim happened to be standing at her window as Romero-Ochoa walked by that early morning.

According to Romero-Ochoa, she called him over and directed him to come through her window because she did not want to open the front door. Romero-Ochoa did as she asked, although he was concerned about waking her daughter. The two then went into the living room where they started to discuss their past relationship and the toll it had taken on their families. They decided to have sex, but Romero-

---

[4] According to her sister Deici, the victim was never married to her daughter's father but did refer to him as her "husband" when they were together. 9 VRP (Oct. 26, 2015) at 80.

[5] Later, on cross-examination, Romero-Ochoa testified that the affair ended in 2012. Romero-Ochoa struggled with dates at several points; for example, immediately after testifying that he had been divorced from his wife for three years in July 2014, he told the prosecutor that he was divorced in 2013.

Ochoa wanted to take a bath first because he was sweaty. The victim would not let him. She started taking her clothes off, and then the two of them began having sex on the living room couch at around 2:45 or 3 a.m. At some point, they fell off the couch. Romero-Ochoa did not know whether the victim hurt herself when they fell, but she "hit herself on the carpeting." 9 VRP (Oct. 26, 2015) at 20. At that point, Romero-Ochoa no longer wanted to have sex because he was still dirty, and the victim became angry, accusing him of indifference toward her. He tried to explain to her that not everything is about sex and that relationships have to be done right, but she would not calm down. She responded by getting "hysterical," mussing up her hair, and grabbing at her own face. *Id.* at 21.

Upset by this, Romero-Ochoa asked the victim to get him a beer to help him calm down. She complied, "[a]nd she gave it to me. And I asked her did she have something with which to open it, and she said no. She just threw it at me. And she was very angry, and at that point she runs out . . . the door." *Id.* at 21. Romero-Ochoa thought she just needed some air, but when he followed her outside she was screaming that he did not love her anymore. In response, he grabbed her and took her back inside. He estimated that they were outside for about 2 or 3 minutes. Once back inside, he asked her whether she was concerned that the neighbors had heard her screaming and she said she was not. As he started taking his pants off, the police

knocked on the door. The victim then "started again acting up" and ran out of the house a second time. *Id.* at 23.

On cross-examination, Romero-Ochoa could not remember the name of the victim's daughter or any hotel the two had ever patronized. Before court broke for lunch, Romero-Ochoa testified that during their affair he and the victim went to dances but did not go out visiting very much because the victim did not have time. After lunch, he testified that they never went out together, that they went dancing at a music venue in the area called El Café, and that he never went to her house. At first he testified that he never went to her house in 2013 because her husband was there, but after he was reminded that the victim was already separated from her daughter's father in 2013, he testified that he never went to her house because everyone in the area knew him and he might have been seen. Romero-Ochoa testified that he had not spoken to his brother, Pascual, about the case (and so would not call him as a corroborating witness) because Pascual believed that a person should clean up his own messes.

When asked if there was anything on the window when the victim called to him through it, Romero-Ochoa at first said no; when pressed to recall whether there was a blanket on the window, Romero-Ochoa said yes, there was, but both the

blanket and the blinds were behind the victim, who was leaning her upper body out of the window.

When asked about the injuries the victim presented with at the ER that morning, Romero-Ochoa speculated that she might have sustained the bruising to her knee, which he had seen in a photo, when they fell off the couch during sex. When asked whether the fall onto her carpeted floor also caused the injuries to the victim's neck and inner thigh, Romero-Ochoa said he did not know and could not remember because it was a little dark. Romero-Ochoa clarified for the prosecutor that the victim was laughing when the two of them fell onto the carpet during sex, then immediately got dressed when they got up, and then, immediately after getting dressed, became angry and began clawing at her own face because Romero-Ochoa did not want to engage in sex again. Contrary to the testimony of all three neighbors, Romero-Ochoa denied that the victim yelled for help the first time she ran out of her house; he admitted that she had banged on a neighbor's trailer but said that she did this only because she was angry and not because she actually wanted someone to come out. Contrary to the testimony of Guillen-Gonzalez, Romero-Ochoa said he did not grab the victim by the hair or force her back inside her house but that he only persuaded her, with words and a hug, to go back inside.

Finally, the victim's sister Deici took the stand to rebut several aspects of Romero-Ochoa's testimony. She offered the following:

She had lived at the San Francisco Avenue trailer park since 2007 and recognized Romero-Ochoa as someone who used to live there, although she did not know him personally. She worked at Taqueria El Sabroso, a business owned and operated by her family members. Romero-Ochoa's brother, Pascual, had once worked on her trailer, but Romero-Ochoa never worked there with him. Deici's brother Leonel did now live in Mexico, but her other brother, Gil, had lived in Montana, not Okanagan, for at least 16 years.

Deici saw the victim every day; the two regularly spent the hours between 10 a.m. and 4 p.m. together, and Deici watched the victim's daughter every day from 4 p.m. to 10:30 p.m. while the victim was at work. The two sisters did everything together and were very close. They talked about relationships all the time. The victim did not have a boyfriend because she spent most of her time with her daughter. Deici had never seen Romero-Ochoa with the victim and had never watched the victim's daughter after 10 p.m.

On cross-examination, defense counsel pressed Deici to say that her brother Gil had once lived in Okanagan; that her brother Leonel had owned a restaurant/shop called El Compadre; and that she had sometimes left her child in the care of Romero-

Ochoa's wife. She denied all of these things, adding that she had never heard of a restaurant called El Compadre. Deici said that she had never seen any members of her family with Romero-Ochoa.

In light of the entire trial record, we conclude that any error in excluding the U visa evidence was harmless beyond a reasonable doubt as to all of Romero-Ochoa's convictions. The Court of Appeals' distinction between the unlawful imprisonment conviction and the remaining convictions is unsustainable.

As the prosecutor pointed out in closing, the victim's account was corroborated by three neighbors' testimony about what they saw and heard while Romero-Ochoa was at her house; by the testimony of the police officers who arrived on the scene; and by the testimony of several medical professionals who observed the victim immediately after she arrived at the ER and then throughout the following day as she cried, gave repeated and consistent accounts of her attack, and developed bruises on her neck and legs. By contrast, Romero-Ochoa provided no evidence corroborating his story of a three-year affair with the victim. No witness ever saw them together, and Romero-Ochoa was unable to recount even basic facts about the victim or their ostensible affair, such as her daughter's name or any hotel they ever stayed at. He testified inconsistently that the two went dancing together in public but also that they never went anywhere together for fear of being discovered. No

witness corroborated Romero-Ochoa's account of a close, long-standing friendship with the victim's brother Leonel or an arrangement whereby Romero-Ochoa's ex-wife regularly babysat for the victim's and her sister's children. Those claims, plus others implying knowledge of the family and its restaurant business, were directly refuted by Deici.

Romero-Ochoa's account of July 4, 2014, was also highly implausible. He claimed that his sexual encounter with the victim that morning began when, by random chance, he was passing by her house just as she was leaning out a window that was covered by blinds and a blanket. On a sudden impulse, and although her daughter was sleeping near that window, the victim called out to Romero-Ochoa that he should climb through it. According to Romero-Ochoa, she wanted him to come through the window so she would not have to open the front door, presumably because their affair was a secret and she feared observation by the neighbors. But he also testified that she expressed no concern about the neighbors hearing her when, less than an hour later, she ran screaming from her front door and banged on a neighbor's trailer. To explain the victim's sudden change in behavior, Romero-Ochoa claimed she was a "hysterical" rejected lover. But his U visa conspiracy theory implies that, at some point after their initial chance encounter at the window, the victim hatched a plot to frame him.

Standing on its own, that story would be very difficult for any jury to credit. But here it was also contradicted or undermined by an overwhelming amount of evidence supporting the victim's account. First, there was the physical evidence of the victim's injuries, including a large bruise on her inner thigh, swelling in her wrist, red marks and bruising consistent with strangulation, and an elevated white blood cell count indicative of a stress reaction. Romero-Ochoa's testimony could not explain any of this evidence. There was also testimony by two neighbors who heard muffled screams and cries for help coming from the victim's home, and by one neighbor who saw and heard the victim crying for help as she was dragged into her home by her hair. This conflicts with Romero-Ochoa's testimony that the victim never called for help and that he did not drag her back into the house.[6] Finally, there was the collective testimony of numerous first responders and medical personnel that the victim fled her house, naked from the waist down and visibly panicked, and then remained tearful and anxious for at least 12 hours afterward. For the U visa

---

[6] We also note that Romero-Ochoa's testimony on this issue conflicts with his briefing in this court. In briefing, he argues that the visible injuries to the victim's face and body could all have occurred outside her home, in the course of the unlawful imprisonment (a conviction he does not challenge). He reasons that, by the victim's own account, she and Romero-Ochoa "struggled outside . . . where [Romero-]Ochoa grabbed her hair, threw her to the ground, hit her twice in the face and dragged her along the ground to the door while her bottom half was unclothed." Suppl. Br. of Resp't at 16 (citing 6 VRP (Oct. 20, 2014) at 16-18, 55).

impeachment theory to have undermined any of this testimony, the jurors would have to have believed that the victim hatched an elaborate immigration fraud scheme during the hour or so that Romero-Ochoa was in her home—after she fortuitously spotted him from her window but before the police arrived.

We recognize that a prosecution witness's U visa application could, given the right set of facts, support a defense theory milder than outright fraud. As the Court of Appeals noted in this case, the U visa incentive structure could lead a witness merely to "embellish" allegations rather than fabricate them out of thin air. *Romero-Ochoa*, No. 48454-4-II, slip op. at 12; *see also Romero-Perez v. Commonwealth*, 492 S.W.3d 902, 906-07 (Ky. Ct. App. 2016) ("Even if the victim did not outright fabricate the allegations against the defendant, the structure of the [U visa] program could cause a victim to embellish her testimony in the hopes of being as 'helpful' as possible to the prosecution."). But in this case, the difference between the State's and the defendant's theories was not plausibly a matter of embellishment. Either Romero-Ochoa committed first degree rape predicated on burglary or he was invited into the victim's home and committed at most second degree rape. The jury found he committed burglary and first degree rape. In light of the overwhelming evidence supporting that conclusion, we can say beyond a reasonable doubt that

cross-examination on the victim's U visa application would not have resulted in a different verdict.

The Court of Appeals reversed Romero-Ochoa's rape and assault convictions based on the conclusion that "[the victim]'s testimony with regard to [Romero-]Ochoa's conduct inside her [house] was not cumulative to any other witness testimony and was not corroborated by any other witness" and because "[a]lthough the State's evidence against [Romero-]Ochoa was strong, its strength depended entirely on the jury finding [the victim]'s testimony credible." *Romero-Ochoa*, No. 48454-4-II, slip op. at 15. This is incorrect. The victim's account of the events inside her house was corroborated by every witness who testified that they heard her screams or documented or treated her injuries, and by her sister, who rebutted Romero-Ochoa's uncorroborated account of a secret three-year affair. The strength of the State's evidence did not "depend[] entirely" on the victim's credibility. *Id.* Instead, the State's theory and the victim's credibility were both bolstered by an overwhelming amount and variety of evidence.

The Court of Appeals also erred by distinguishing between the unlawful imprisonment conviction, corroborated by one neighbor's eyewitness testimony, and the other convictions, corroborated by numerous other forms of evidence. For example, just as a neighbor saw Romero-Ochoa pull the victim back inside her house

by her hair, others also heard loud thumping noises coming from inside and later saw the victim running out, half naked and visibly frightened. As the State points out, such "'overwhelming circumstantial evidence'" can render a constitutional error harmless beyond a reasonable doubt. Suppl. Br. of Pet'r at 5 (emphasis omitted) (quoting *Hieb*, 107 Wn.2d at 111-12). There is no eyewitness evidence prerequisite to a finding of harmless error. Instead, an appellate court makes the harmless error determination on the basis of the entire record. *Hieb*, 107 Wn.2d at 110 (quoting *Guloy*, 104 Wn.2d at 426). Here, that record compels a finding of harmless error as to all of Romero-Ochoa's convictions.

## CONCLUSION

We reverse the Court of Appeals' harmless error holding with respect to the convictions for rape, burglary, and assault. Any error in prohibiting cross-examination on the U visa application was harmless as to all of Romero-Ochoa's convictions. We thus reinstate the rape, burglary, and assault convictions and remand to the Court of Appeals to address Romero-Ochoa's claim of sentencing error.

Stephens, J.

WE CONCUR:

Fairhurst, C.J.

Wiggins, J.

Johnson, J.

González, J.

Madsen, J.

Yu, McCloud, J.

Owens, J.

Yu, J.