# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 57541-8-II |
| Respondent, | |
| v. | |
| VLADIMIR VASILYEVICH NIKOLENKO, | Consolidated with: |
| Appellant. | |
| In the Matter of the Personal Restraint of: | No. 58865-0-II |
| VLADIMIR VASILYEVICH NIKOLENKO, | |
| Petitioner. | UNPUBLISHED OPINION |

LEE, J. — Vladimir V. Nikolenko appeals his conviction for one count of indecent liberties with forcible compulsion with a deadly weapon sentencing enhancement. He also filed a timely personal restraint petition (PRP) seeking relief from restraint resulting from his conviction. We consolidated Nikolenko's PRP with his direct appeal.

Nikolenko argues that the trial court abused its discretion and violated his right to present a defense by excluding evidence about the victim's immigration status. We hold that the trial court violated Nikolenko's right to present a defense by excluding evidence about the victim's

immigration status and that this error was not harmless. Accordingly, we reverse and remand for a new trial.[1]

FACTS

A.    BACKGROUND

FT immigrated to the United States from Mexico when she was five years old. She was a nurse and began working in May 2016 as a caregiver at an adult care facility run by Nikolenko's sister, Olga Fisenko. The facility was inside Fisenko's home—Fisenko, her husband, and children lived in the basement and second floors of the house, while the facility residents lived on the main ground floor.

Fisenko and Nikolenko's father died November 25, 2016, the day after Thanksgiving. The funeral was to be held in Colorado. On November 29, Nikolenko spent the night at Fisenko's house, and the siblings boarded a plane to Colorado in the late morning on November 30.

FT started work at about 7 a.m. on November 30. That morning, Nikolenko walked up behind FT carrying a kitchen knife when FT was in the hallway collecting towels for a patient in the shower. Nikolenko grabbed FT, pulled her into a bathroom, and began to grope her while holding the knife to her face. FT called out for Fisenko, and Fisenko appeared and took Nikolenko downstairs. FT's patient in the shower called for her, so she resumed working.

---

[1] Nikolenko also argues that (1) the trial court abused its discretion by not admitting the victim's time sheets, and (2) he received ineffective assistance of counsel because trial counsel (a) failed to investigate his alibi or present testimony of corroborating witnesses, (b) failed to impeach the victim on cross-examination, and (c) refused to let him testify in his own defense. Because we reverse on other grounds, we do not address these arguments.

Although FT feared that she would be deported if she called the police, she told Fisenko that she was going to report the incident. Fisenko told FT to not say anything about the incident, telling her that Nikolenko would not come back and that Fisenko needed FT to keep working. Fisenko assured FT that she would report the incident and that FT did not need to do anything.

FT suffered from anxiety and nightmares after the incident. In January 2017, FT told Fisenko that she would be seeing a psychologist about the incident, and Fisenko fired her. FT then told the psychologist about the incident. The psychologist encouraged FT to call the police, which FT did.

In approximately August 2017, FT applied for a U visa, which gives temporary immigration status to victims of certain crimes who help investigate or prosecute those crimes. It is not clear from our record whether the U visa application was granted.[2]

In April 2018, the State charged Nikolenko with one count of indecent liberties with forcible compulsion and alleged that he was armed with a deadly weapon during the offense. Nikolenko's jury trial began in August 2022.[3]

---

[2] There is no U visa or U visa application in the appellate record.

Nikolenko's counsel listed exhibits related to that evidence in the designation of clerk's papers, but the superior court clerk's office reported that the exhibits were returned to counsel at the conclusion of the trial because they were not admitted as evidence. These exhibits are not in the clerk's possession.

[3] The trial court ordered multiple competency evaluations and competency restorations, starting in March 2019. Nikolenko's competency to stand trial was not restored until April 2021; thus, there was a lengthy delay in the proceedings.

B.    TRIAL PROCEEDINGS

Nikolenko filed proposed exhibits seeking to admit evidence that FT applied for a U visa. The State objected, relying on ER 413, which allows a trial court to admit evidence of immigration status only if the offering party has made an offer of proof in a written motion supported by affidavits *and* the trial court finds that the evidence is reliable, relevant, and has probative value outweighing its prejudicial effect.  ER 413(a)(1)-(4).  The State emphasized that Nikolenko had not followed ER 413's procedure.  The State also argued that FT applied for a U visa seven months after reporting the incident to law enforcement, so the evidence had limited probative value to show FT's motive of inventing a crime in order to secure her immigration status.  The trial court excluded the U visa evidence because Nikolenko had failed to comply with ER 413's procedural requirements and because "given the timing" of the application, the court did not see how the evidence "would do anything but confuse the jury."  Verbatim Rep. of Proc. (VRP) at 72.

At trial, FT testified consistent with the facts described above.  At one point, FT testified that Nikolenko touched her breast with one hand.  Defense counsel then refreshed her recollection with a transcript from a defense interview, and FT then testified that Nikolenko put the knife down and touched her with both hands.  FT also testified that about 30 minutes after the incident which formed the basis for the charge, she saw Nikolenko again, this time sitting in the living room on the patients' floor with his pants down, touching his penis.  She stated that she again found Fisenko and told her what Nikolenko was doing.  FT further testified that Fisenko was happy with the quality of her work until FT mentioned in January 2017 about going to a counselor about the charged incident.  And although FT believed that she would recognize Nikolenko if she saw him again, she testified that she did not see her assailant in the courtroom.

4

FT's psychologist testified that FT presented as hypervigilant, anxious, suffering from nightmares, and struggling with intimacy because she had not told her husband about the incident. FT told the psychologist that Nikolenko "came upon her suddenly, grabbed her arm, then touched her breast with one hand while holding a large knife in the other." VRP at 173. The psychologist also testified that FT told her she saw Nikolenko in the living room "several hours" after the charged incident. VRP at 173. FT told the psychologist that the charged incident occurred "prior to Thanksgiving 2016." VRP at 172.

FT's husband testified that in the fall of 2016, FT struggled with intimacy for the first time in their 20-year relationship, but this resolved after she went to counseling and then told her husband about the incident.

Nikolenko did not testify at trial. Nikolenko called Fisenko to testify. Fisenko testified that she never saw FT near Nikolenko at all before the siblings left to catch their plane. Fisenko also testified that the living room encounter involving Nikolenko occurred earlier in November 2016, when Nikolenko visited her for his birthday; Fisenko denied that Nikolenko did anything inappropriate during that visit. But an officer who had interviewed Fisenko in February 2017 testified that during the interview, Fisenko stated that FT and Nikolenko had an encounter in late November 2016 where Nikolenko was "doing something with the waistband of his pants" in the living room. VRP at 156.

Fisenko further testified that FT was a difficult employee who regularly threatened to report Fisenko to state authorities if Fisenko fired her. Fisenko claimed that she fired FT because FT came to work sick, and FT had intended to stop working for Fisenko at the end of January 2017 anyway.

In closing argument, the State argued that FT "was scared to tell authorities" about the incident "because she was afraid that they wouldn't believe her and/or she would be sent back to Mexico." VRP at 261. The State also argued that FT was not fabricating her story because, despite understanding that Nikolenko was on trial, she did not identify him as her assailant in the courtroom.

Nikolenko's closing argument emphasized inconsistencies between FT's trial testimony, what she reported to the psychologist, and what she said in her defense interview, such as conflicting dates, times, and details about the incident. Nikolenko argued that FT fabricated the incident in retaliation for Fisenko firing her. He emphasized the inconsistencies in FT's story that made it difficult to understand when and where in the house the charged incident occurred. He also highlighted testimony from Fisenko where she asserted that the siblings left Fisenko's house around 7 a.m., just as FT would have been starting work, meaning that there wouldn't have been enough time for Nikolenko to assault FT.

The jury convicted Nikolenko of indecent liberties with forcible compulsion and entered a special verdict finding that he was armed with a deadly weapon at the time of the crime. The trial court imposed an indeterminate sentence at the middle of the standard sentencing range of 84 months to life.

Nikolenko appeals his conviction, arguing that the trial court should have admitted the evidence regarding FT's U visa application.

C.     CrR 7.8 MOTION/PRP

After appealing, Nikolenko filed a CrR 7.8 motion in the trial court. He argued that the trial court should vacate his conviction because he received ineffective assistance of trial counsel

when counsel failed to investigate and present alibi evidence, evidence of FT's bias, and testimony from corroborating witnesses. Nikolenko also argued that he wanted to testify at trial but trial counsel refused to call him as a witness.

The trial court ruled that Nikolenko failed to make a substantial showing that he was entitled to relief and transferred the CrR 7.8 motion to this court as a PRP. This court then consolidated Nikolenko's PRP with his direct appeal.

ANALYSIS

Nikolenko argues that the trial court abused its discretion by excluding evidence that FT applied for a U visa. He asserts that the U visa evidence was probative of FT's bias and that excluding it violated his right to present a defense. Nikolenko suggests that he "could have cross examined [FT] about her increasing boldness in asserting her allegations after applying for the U-visa" or "about why she even felt it was necessary to apply for U-visa status." Reply Br. of Appellant at 2.

The State responds that the trial court properly excluded the evidence because Nikolenko failed to comply with the procedural components of ER 413. The State also argues that the U visa evidence was not sufficiently probative to any defense to outweigh its prejudicial effect. The State asserts that Nikolenko argued below both fabrication and alibi defenses without needing to mention the U visa. And the State contends that any error in excluding the evidence was harmless beyond a reasonable doubt. We hold that the trial court violated Nikolenko's right to present a defense and that this error was not harmless, requiring a new trial.

A.  LEGAL PRINCIPLES

We review a trial court's evidentiary rulings for abuse of discretion. *State v. Restvedt*, 26 Wn. App. 2d 102, 122, 527 P.3d 171 (2023).  "A trial court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons."  *State v. Lord,* 161 Wn.2d 276, 283-84, 165 P.3d 1251 (2007).  But "[i]f the court excluded relevant defense evidence, we determine as a matter of law whether the exclusion violated the constitutional right to present a defense."  *State v. Clark*, 187 Wn.2d 641, 648-49, 389 P.3d 462 (2017)

To determine if a defendant's right to present a defense was violated by a limitation on cross-examination, we first review for abuse of discretion "whether the excluded evidence was at least minimally relevant."  *State v. Orn*, 197 Wn.2d 343, 353, 482 P.3d 913 (2021).  If yes, we consider whether there was a compelling interest to exclude the evidence, which occurs when "the evidence was so 'prejudicial as to disrupt the fairness of the factfinding process' at trial."  *Id.* (quoting *State v. Hudlow*, 99 Wn.2d 1, 15, 659 P.2d 514 (1983)); *State v. Bravo*, __ Wn. App. 2d ___, 563 P.3d 1068, 1076 (2025).  We then review "whether the State's interest in excluding the prejudicial evidence outweighs the defendant's need to present it."  *Orn*, 197 Wn.2d at 353.

"[T]he right to present evidence of a witness's bias is essential to the fundamental constitutional right of a criminal defendant to present a complete defense, which encompasses the right to confront and cross-examine adverse witnesses."  *Id.* at 352.  "Evidence of bias is particularly probative of a witness's credibility when it stems from a witness's motive to cooperate with the State based on the possibility of leniency or the desire to avoid prosecution."  *Id.* at 354.  If impeachment evidence has been improperly excluded, the error may be "harmless if, in light of the entire trial record, we are convinced that the jury would have reached the same verdict absent

the error." *State v. Romero-Ochoa*, 193 Wn.2d 341, 348, 440 P.3d 994 (2019), *cert. denied*, 141 S. Ct. 398 (2020). It is the State's burden to show that the error was harmless beyond a reasonable doubt. *Id*.

ER 413(a) provides that in criminal cases "evidence of a party's or a witness's immigration status shall not be admissible unless immigration status is an essential fact to prove an element of, or a defense to, the criminal offense with which the defendant is charged, or to show bias or prejudice of a witness." The rule contains a mandatory procedure that "shall apply prior to any such proposed uses of immigration status evidence to show bias or prejudice of a witness." ER 413(a). The offering party must first make "an offer of proof of the relevancy of the proposed evidence" in a written pretrial motion, accompanied by affidavits. ER 413(a)(1)-(2). If the trial court "finds that the offer of proof is sufficient," the court may then hold a hearing. ER 413(a)(3). At the hearing, the trial court "may admit evidence of immigration status to show bias or prejudice if it finds that the evidence is reliable and relevant, and that its probative value outweighs the prejudicial nature of evidence of immigration status." ER 413(a)(4). However, "[n]othing in this section shall be construed to exclude evidence if the exclusion of that evidence would violate a defendant's constitutional rights." ER 413(a)(5).

B.     CASES DISCUSSING IMMIGRATION EVIDENCE AND THE RIGHT TO PRESENT A DEFENSE

In a case that went to trial before ER 413 took effect, the Washington Supreme Court held that a trial court ruling excluding evidence that a rape victim twice applied for a U visa was harmless error. *Romero-Ochoa*, 193 Wn.2d at 344. In that case, "an overwhelming amount of evidence"—including physical evidence of injuries and witnesses who heard cries for help— supported the rape victim's account, while the defendant's theory of the case would have required

the jury to believe "that the victim hatched an elaborate immigration fraud scheme" in the hour between when she met the defendant and when she called the police. *Id.* at 361-62.

Also, Division One of this court has held that strict compliance with ER 413's procedure was not required when the rule took effect three days before a defendant's trial began, neither party mentioned the rule, and strict compliance would have required motions practice to occur before the rule was in effect. *State v. Bedada*, 13 Wn. App. 2d 185, 194-97, 463 P.3d 125 (2020). And "it has long been the law in our state that rules that impose procedural requirements cannot be wielded as a sword by the State to defeat the constitutional rights of an accused in a criminal trial." *State v. Chicas Carballo*, 17 Wn. App. 2d 337, 349, 486 P.3d 142, *review denied*, 198 Wn.2d 1030 (2021).

In *Chicas Carballo*, tried shortly after ER 413 took effect, a trial court prohibited a defendant from cross-examining the State's key witness about her immigration status in part due to Chicas Carballo's failure to comply with ER 413's procedural requirements. *Id.* at 347-48. The witness in that case had changed her story during an interview with law enforcement after being threatened with deportation. *Id.* at 350. In her trial testimony, the witness "conceded to lying and even went so far as admitting during cross-examination that she was fearful she might be arrested and that she was pregnant and did not 'want something bad for [her] son.'" *Id.* at 351 (alteration in original) (quoting record).

On appeal, the court held that evidence about the witness' immigration status was highly relevant because "[h]ad she been confronted with the deportation threat and its applicability to her because of her immigration status, a jury could reasonably find that her fear of arrest and for her son's welfare was related to the threat of deportation by police." *Id.* Further, "any fear of

generalized anti-immigrant prejudice by the jury would cut against those parties equally, but most particularly against the defendants," who were immigrants, members of an El Salvador gang, and required interpreters at trial. *Id*. at 352. And without the witness' testimony, the only evidence linking Chicas Carballo to the charged murder was phone records and money transfers to a codefendant. *Id*. at 355. As a result, the court held that the trial court's ruling violated Chicas Carballo's right to present a defense, and that the error was not harmless. *Id*.

Recently, Division One again remanded a case for a new trial on a similar basis. *Bravo*, 563 P.3d at 1071. Bravo was charged with second degree rape of a child; both the victim and her sister were undocumented immigrants. *Id.* at 1071-72. The trial court limited cross-examination of both the victim and her sister about the family's application for U visas. *Id.* at 1072-73. On appeal, Division One held that the evidence was relevant because "the structure of the U visa program can encourage some victims to be as helpful as possible to the prosecution in order to obtain citizenship," which "could have motivated either [witness] to embellish their stories and allegations." *Id.* at 1076. And the State's argument that the evidence was prejudicial focused "on the need to bring in a witness to explain the U visa process, and on the potential need to either dismiss a sitting juror with immigration experience or declare a mistrial," which, while inconvenient, "did not meet [the State's] burden of demonstrating a compelling interest in excluding prejudicial or inflammatory evidence." *Id.* Accordingly, "[t]he fact that there could have been a mistrial or a 'mini-trial' over immigration does not outweigh Bravo's constitutional right to meaningfully cross-examine the key witness against him." *Id.* at 1077. And because there was no physical evidence; limited corroborating evidence of the victim's testimony, none of which was contemporaneous to the rape; and the State's closing argument asserted that the victim and

11

her sister had no motive to lie; the victim's "credibility was critical." *Id.* at 1078. Thus, the error was not harmless, requiring remand for a new trial. *Id.*

C. ANALYSIS

ER 413 took effect in 2018. Nikolenko's trial took place in 2022. The record shows that both the State and the trial court were aware of ER 413 at the time of trial. And it is undisputed that Nikolenko did not comply with ER 413's procedure when seeking to admit evidence about FT's U visa application. But ER 413's procedural requirements cannot mandate an exclusion of evidence when doing so violates the defendant's Sixth Amendment right to present a defense. ER 413(a)(5); *Chicas Carballo*, 17 Wn. App. 2d at 349.

As discussed above, to determine whether a defendant's right to present a defense was violated by a limitation on cross-examination, we first determine if FT's immigration status was "at least minimally relevant." *Orn*, 197 Wn.2d at 353. FT testified that she did not immediately call the police because she feared that she would be deported if she did so, and the State relied on this testimony to argue that FT was credible during closing arguments. In light of this testimony and argument, the fact that FT had applied for a U visa which would protect her from deportation as long as she cooperated with Nikolenko's prosecution was clearly relevant impeachment evidence. *Id.*

Next, the State argues that FT's immigration status could have distracted or confused the jury. But the State itself elicited testimony that FT did not call the police because she feared deportation, undermining its argument that such evidence could distract the jury. Thus, the fact that additional testimony may have been required to explain the U visa program to the jury does

not rise to the level of demonstrating a compelling interest in excluding the evidence. *See Bravo*, 563 P.3d at 1076.

Further, the relevance of the evidence outweighs any prejudice. The State argues that the probative value of the evidence did not outweigh its prejudicial effect because Nikolenko still challenged inconsistencies between FT's testimony and prior statements, and there was no evidence in the record that FT "was motivated to alter her immigration status or was aware of the availability of U visas for victims of crimes prior to reporting Nikolenko's sexual assault to the police." Br. of Resp't at 25. But the U visa program could have incentivized FT to embellish her testimony, and evidence about the program would have allowed Nikolenko to address the differences between FT's trial testimony and statements she made before she applied for the U visa.

Additionally, "'[a] defendant enjoys more latitude to expose the bias of a key witness.'" *Bedada*, 13 Wn. App. 2d at 205 (quoting *State v. Fisher*, 165 Wn.2d 727, 752, 202 P.3d 937 (2009)). FT was the centerpiece of the State's case. Although FT's psychologist partially corroborated her testimony by repeating what FT reported several months after the incident, there was no contemporaneous corroborating evidence nor was there any physical evidence of the incident. And FT's report to the psychologist lacked details FT included in her testimony, such as being dragged into a bathroom, or contained conflicting information, such as stating that the incident occurred before Thanksgiving even though Nikolenko's father did not die until the day after Thanksgiving. Because the case centered on FT's credibility, any risk of confusion the U visa evidence would have posed did not outweigh Nikolenko's constitutional right to meaningfully cross-examine the State's key witness. *Bravo*, 563 P.3d at 1077. Thus, excluding evidence about

the U visa violated Nikolenko's right to present a defense and constituted an abuse of discretion. *Orn*, 197 Wn.2d at 358.

Moreover, the constitutional error was not harmless. "In the context of an erroneous exclusion of impeachment evidence, '[t]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, [we can] nonetheless say that the error was harmless beyond a reasonable doubt.'" *Romero-Ochoa*, 193 Wn.2d at 348 (alterations in original) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986)).

The State argues that the U visa evidence had little weight because FT's psychologist corroborated her version of events and FT failed to identify Nikolenko as her attacker in court. But evidence that FT applied for a U visa would have been at least minimally probative of FT's bias and allowed Nikolenko to argue that she embellished the incident rather than outright fabricated it. And as discussed above, the psychologist did not completely corroborate FT's version of events, so the U visa evidence would have allowed Nikolenko to argue that FT was embellishing her story to secure her immigration status. Instead, like in *Chicas Carballo*, FT's testimony that she feared deportation went unchallenged, and the State relied on this testimony in closing argument, even though that fear would have been a basis for FT to seek the U visa and cooperate with the investigation. In sum, the State does not prove beyond a reasonable doubt that the jury would have reached the same verdict absent any error.

Accordingly, we reverse Nikolenko's conviction and remand for a new trial.[4]

---

[4] Nikolenko also argues that the trial court abused its discretion by excluding FT's November 2016 and December 2016 time sheets and that he received ineffective assistance of counsel. Because we remand for a new trial, we decline to reach these issues.

CONCLUSION

We reverse Nikolenko's conviction and remand for a new trial.[5]

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Maxa, P.J.

Glasgow, J.

---

[5] Because we reverse Nikolenko's conviction and remand for a new trial, we do not reach the claims raised in Nikolenko's PRP.