# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 51589-0-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| ALBERTO COLT SARMIENTO, | |
| Appellant. | |

MAXA, J. – Alberto Colt Sarmiento appeals his convictions of second degree murder, two counts of first degree assault, and second degree unlawful possession of a firearm. The convictions arose from a shooting that occurred at the time and location that Sarmiento, a Varrio Sureño Lokotes (VSL) gang member, had arranged a fistfight with Eddie Contreras, who claimed to represent another Sureño gang. Sarmiento was present at the location along with his friends Juan Zuniga and Trino Martinez. When Contreras and two others arrived at the fight location, Sarmiento stood by his truck while Zuniga ran out from some bushes toward Contreras and the others and fired multiple gunshots at them. One of the men with Contreras died of a gunshot wound at the scene and the other sustained a serious gunshot wound.

We hold that (1) any error regarding the issuance of various search warrants that Sarmiento challenges was harmless because the untainted evidence of Sarmiento's guilt on all charges was overwhelming; (2) Sarmiento's trial counsel was not ineffective for failing to

request a "defense of others" jury instruction because there was a legitimate strategic reason for not wanting that instruction; (3) the cumulative error doctrine is inapplicable because any error was harmless; (4) the evidence was sufficient to sustain Sarmiento's conviction of second degree unlawful possession of a firearm; and (5) Sarmiento's assertions in a statement of additional grounds (SAG) lack merit. Accordingly, we affirm Sarmiento's convictions.

FACTS

*Background*

Sarmiento and Contreras met in September 2015 when they engaged in a fistfight. The two shook hands after the fight, exchanged names, and spoke briefly. Sarmiento introduced himself as "Taxer" and said that he was a member of the VSL gang. Contreras told Sarmiento he was a member of the 18th Street, another Sureño gang.

A week or two after the fight, Sarmiento sent Contreras a friend request on Facebook, which Contreras accepted. Sarmiento initiated conversations with Contreras via Facebook Messenger, which were friendly at first but became more adversarial after Sarmiento began to suspect that Contreras was not really a member of the 18th Street gang. Sarmiento and Contreras exchanged messages that each regarded as disrespectful and insulting. Sarmiento complained to others on Facebook about Contreras's insult.

On November 1, Sarmiento sent Contreras a message challenging him to another fight, and Contreras accepted. Sarmiento messaged Contreras again on November 2, and the two men agreed to meet that night for a fistfight without weapons.

*November 2, 2015 Shooting*

Just before the scheduled fight on November 2, Sarmiento, Zuniga, and Martinez gathered at Steven Gamez's residence. Gamez, Zuniga, and Martinez were all gang members

affiliated with the Southside Criminals, another Sureño gang. Martinez displayed a gun and passed it to Zuniga, who also handled it. Sarmiento was there and saw the gun. Sarmiento discussed his anger at a person who was posing as an 18th Street gang member and had disrespected Sarmiento. Sarmiento, Zuniga, and Martinez talked about doing work for the gang.

Sarmiento, Zuniga, and Martinez left Gamez's residence in Sarmiento's truck with the gun. Martinez gave Zuniga the gun after they made a brief stop. They then drove to the location of the planned fistfight.

Contreras brought his friends Elijah Crawford and Isaac Fogalele to the planned fight to provide backup if necessary. When they arrived at the fight location, Sarmiento was standing outside his parked truck. Contreras, Crawford, and Fogalele got out of Contreras's vehicle, and as Contreras started walking Sarmiento said, "You talking shit, huh?" 9 Report of Proceedings (RP) at 892. Sarmiento signaled to Zuniga, who was in the bushes nearby, by calling his nickname "Mobster."

Zuniga, who was wearing a bandana over his face, came running out of some bushes toward Contreras, Crawford, and Fogalele with a gun and started shooting at them. Sarmiento stood there without ducking to take cover, and Contreras stated that it was as if "he knew what was going on." 9 RP at 911. Crawford was shot in the back and died at the scene. Fogalele was injured by a bullet. Contreras was uninjured but heard bullets flying by him as he ran away. After the shooting, Sarmiento, Zuniga, and Martinez left the scene in Sarmiento's truck.

*Investigation and Charges*

Contreras spoke with detectives later that night and showed them his Facebook communications with "Taxer." Contreras identified Sarmiento through photos posted on Facebook. Police subsequently issued a warrant for his arrest.

On November 5, 2015, police obtained a search warrant for Sarmiento's Facebook account. On November 5 and 9, they obtained search warrants for the records relating to four phone numbers that Sarmiento previously had used. On November 12 and 17, police obtained search warrants for the Facebook accounts of Martinez and Jose Salinas. Salinas was a person with whom Sarmiento exchanged gang-related messages publicly on Facebook.

After the shooting, Sarmiento fled the area and stayed with his uncle Raymundo Gomez in Centralia. Gomez subsequently learned of the warrant for Sarmiento's arrest. When Gomez confronted Sarmiento, he admitted to Gomez that he planned the shooting with his friends. Gomez called police a few days later and reported Sarmiento's location.

Police arrested Sarmiento on November 16. Two cell phones were recovered from the scene, one (referred to as the HTC phone) in a freezer wrapped in aluminum foil and another (referred to as the LG phone) located in the storage area where Sarmiento was found hiding. On November 17, police obtained search warrants for the HTC and LG phones.

Zuniga became a person of interest after police saw a Facebook message from Zuniga to Sarmiento after the shooting saying Zuniga had left his backpack in Sarmiento's truck.

The State charged Sarmiento with one count of first degree murder (count I), one count of second degree murder (count II), two counts of first degree assault (counts III and IV), and one count of second degree unlawful possession of a firearm (count V). Sarmiento was charged as an accomplice as to counts I through IV. Counts I through IV also included firearm sentencing enhancements, and all five counts included a gang aggravator.

Zuniga and Martinez also were charged with multiple counts. Zuniga pleaded guilty to first degree murder and two counts of attempted first degree murder. Martinez was scheduled to be tried jointly with Sarmiento, but Martinez later also pleaded guilty.

*Motion to Suppress Evidence*

Sarmiento moved to suppress evidence derived from the search warrants issued for the HTC and LG phones, his phone records, his Facebook account, and Martinez's and Salinas's Facebook accounts. The trial court reviewed the challenged search warrants and accompanying affidavits and denied Sarmiento's motions.

*Evidence at Trial*

The State argued that Sarmiento planned an ambush shooting in retaliation for perceived disrespect from Contreras. The State presented evidence regarding the events leading up to the shooting and the shooting itself as described above. The trial court admitted exhibits containing information discovered in the searches of the two phones, Sarmiento's Facebook account, and Martinez's Facebook account. No evidence obtained from Sarmiento's phone records or Salinas's Facebook account was admitted at trial.

Sarmiento did not testify at trial. Zuniga testified for the defense. He testified that he, Sarmiento, and Martinez left Gamez's house in Sarmiento's truck with the gun that they had been handling. Martinez gave the gun to Zuniga when they made a stop while Sarmiento stood on the other side of the truck. Martinez told Zuniga it was time to "earn your stripes." 14 RP at 1857. Sarmiento told Zuniga "Don't be worried," "Don't be afraid," and "Be ready." 14 RP at 1913. When they left, Zuniga sat next to the window while Martinez sat between him and Sarmiento. Martinez gave Zuniga the gun "just in case" because Zuniga was "riding shotgun." 14 RP at 1816. Zuniga said that Sarmiento saw him with the gun sometime that night.

Zuniga testified that he, Sarmiento, and Martinez then drove to the fight location and Zuniga went into the bushes and put a bandana over his face. After Contreras's vehicle pulled up and three individuals got out, Sarmiento signaled to Zuniga, who opened fire. Zuniga claimed he

thought the three individuals were rival gang members and he panicked. He also claimed it was not a planned shooting.

Defense counsel did not request a "defense of others" jury instruction. Sarmiento argued in his opening statement and closing argument that he planned only a fistfight and that he had no knowledge of or involvement in Zuniga's shooting.

*Verdict*

The jury convicted Sarmiento of first degree manslaughter as a lesser offense to first degree murder, second degree murder, two counts of first degree assault, and second degree unlawful possession of a firearm. The jury also found by special verdict that Sarmiento was armed with a firearm for counts I through IV and that the gang aggravator applied for all counts. The trial court vacated the manslaughter conviction to avoid double jeopardy.

Sarmiento appeals his convictions.

## ANALYSIS

A.   VALIDITY OF SEARCH WARRANTS

Sarmiento argues that the trial court erred in denying his motion to suppress the evidence seized pursuant to search warrants for his HTC and LG phones, his phone records, his Facebook accounts, and Martinez's and Salinas's Facebook accounts. He claims that the warrants lacked probable cause and violated the particularity requirement of the Fourth Amendment. We conclude that even if the trial court erred in denying his motion to suppress one or more of the search warrants, any error was harmless.

1.   Legal Principles

The Fourth Amendment to the United States Constitution and article I, section 7 of the Washington Constitution impose two requirements for search warrants. *State v. Higgs*, 177 Wn.

App. 414, 425, 311 P.3d 1266 (2013). First, a warrant can be issued only if supported by probable cause. *State v. Lyons*, 174 Wn.2d 354, 359, 275 P.3d 314 (2012). Second, a search warrant must be sufficiently particular so that the officer executing the warrant can reasonably ascertain and identify the property authorized to be seized. *State v. Besola*, 184 Wn.2d 605, 610, 359 P.3d 799 (2015). "Warrants for materials protected by the First Amendment require a heightened degree of particularity." *Id.* at 611.

In determining whether probable cause supports challenged warrants, we can consider the search warrant affidavits presented to the judge issuing the warrants. *See Lyons*, 174 Wn.2d at 363 ("We cannot defer to the magistrate where the affidavit does not provide a substantial basis for determining probable cause"). However, in assessing the particularity requirement, we may only consider search warrant affidavits if they are attached to or incorporated by reference by the warrant itself. *State v. Riley*, 121 Wn.2d 22, 29, 846 P.2d 1365 (1993).

2.    Harmless Error

We apply a harmless error analysis when the trial court admits evidence that is a product of an invalid warrant. *State v. Keodara*, 191 Wn. App. 305, 317-18, 364 P.3d 777 (2015). Admission of evidence obtained through a warrant that violates constitutional requirements is an error of constitutional magnitude. *Id.* at 317. An error of constitutional magnitude is harmless "if, in light of the entire trial record, we are convinced that the [factfinder] would have reached the same verdict absent the error." *State v. Romero-Ochoa*, 193 Wn.2d 341, 348, 440 P.3d 994 (2019).

The State bears the burden of showing beyond a reasonable doubt that the error did not contribute to the verdict. *Keodara*, 191 Wn. App. at 317-18. One way to establish harmless error is to show that the untainted evidence is so overwhelming that it necessarily leads to a

finding of guilt. *Id.* at 318. We also can look to the "overall significance of the erroneously admitted or excluded evidence in this context (e.g., whether it was cumulative or corroborated, or consistent with the defense theory)." *Romero-Ochoa*, 193 Wn.2d at 348.

3. Analysis

We do not address the merits of Sarmiento's challenges to various search warrants. Instead, we assume without deciding that the trial court erred in denying Sarmiento's motion to suppress. We conclude that even if the warrants were invalid, any error in admitting evidence relating to the warrants was harmless because overwhelming untainted evidence supported Sarmiento's murder and assault convictions and the firearm and gang special verdicts.

a. Immaterial Warrants

Initially, the trial court did not admit any evidence that was derived from the search warrants for Sarmiento's phone records or Salinas's Facebook account. Therefore, any error relating to these warrants necessarily could not have affected the outcome of the trial.

b. Murder and Assault Convictions

Undisputed evidence established that Zuniga shot and killed Crawford and assaulted Contreras and Fogalele with a firearm. Fogalele was struck by a bullet and Contreras heard bullets flying by as he ran. Zuniga pleaded guilty to murder and two counts of attempted murder and admitted at trial that he fired the shots. The issue here is whether there was overwhelming untainted evidence at trial that Sarmiento acted as Zuniga's accomplice.

The evidence showed that just before the scheduled fight between Sarmiento and Contreras, Sarmiento expressed his anger at a person – presumably Contreras – who was posing as an 18th Street gang member and had made disrespectful comments regarding Sarmiento. Sarmiento, Martinez, and Zuniga talked about doing work for the gang.

Sarmiento, Zuniga, and Martinez drove in Sarmiento's truck to the fight location with Martinez in possession of a gun. When Martinez gave Zuniga the gun during a stop, he told Zuniga it was time to "earn your stripes." 14 RP at 1857. Sarmiento told Zuniga "Don't be worried," "Don't be afraid," and "Be ready." 14 RP at 1913. Martinez gave Zuniga the gun "just in case" because Zuniga was "riding shotgun." 14 RP at 1816.

When they arrived at the fight location, Sarmiento stood next to his truck while Zuniga went out of sight. Zuniga put a bandana over his face. Zuniga testified that as Contreras confronted Sarmiento, Sarmiento gave Zuniga a signal. Zuniga immediately came running out of the bushes and started firing multiple shots at Contreras and his companions. Sarmiento stood next to his truck without ducking to take cover, according to Contreras as if "he knew what was going on." 9 RP at 911.

After the shooting, Sarmiento told his uncle that he had planned the shooting with his friends.

We conclude that overwhelming untainted evidence established that Sarmiento was an accomplice to second degree murder and two first degree assaults.

c.    Second Degree Unlawful Possession of a Firearm

The State argued at trial and argues on appeal that Sarmiento constructively possessed the firearm that Zuniga used because the gun was in the truck that he was driving. None of the evidence introduced at trial that derived from the search warrants related to Sarmiento's possession of the gun on the night of the shooting. Therefore, we conclude that the jury would have convicted Sarmiento of unlawful possession of a firearm absent any error. *See Romero-Ochoa*, 193 Wn.2d at 348.

d.    Gang Aggravator

The jury was instructed that to find the charged gang aggravator, it had to determine "[w]hether the defendant committed the offense with the intent to directly or indirectly cause any benefit, aggrandizement, gain, profit, or other advantage to or for a criminal street gang, its reputation, influence, or membership." Clerk's Papers (CP) at 243. The gang aggravator related to all five charges.

Sarmiento did not contest at trial that he was a member of the VSL gang. He introduced himself to Contreras as "Taxer" and said that he was a member of the VSL gang. Others knew Sarmiento to be a VSL gang member. Contreras told Sarmiento he represented 18th Street, another Sureño gang. Sarmiento's Facebook Messenger conversations with Contreras became more adversarial after Sarmiento began to suspect that Contreras was not really a member of the 18th Street gang.

Gamez, Zuniga, and Martinez were all gang members affiliated with the Southside Criminals, another Sureño gang. At Gamez's house on the night of the shooting, Sarmiento, Martinez, and Zuniga talked about doing work for the gang. Zuniga wanted to elevate his status within the gang. When Martinez handed Zuniga the gun, Martinez told him to "earn your stripes." 14 RP at 1857. Zuniga felt that he earned his stripes by firing the gun. As noted above, there was extensive evidence at trial to establish that Sarmiento was an accomplice to Zuniga's actions.

We conclude that overwhelming untainted evidence established that Sarmiento or an accomplice committed the charged offenses with the intent to directly or indirectly cause any benefit, aggrandizement, gain, profit, or other advantage to or for a criminal street gang, its reputation, influence, or membership.

B.      INEFFECTIVE ASSISTANCE OF COUNSEL

Sarmiento argues that his defense counsel was ineffective because he failed to request a "defense of others" jury instruction based on the theory that Zuniga acted in defense of Sarmiento when Zuniga shot at Contreras, Crawford, and Fogalele.  We disagree.

1.      Legal Principles

Both the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee criminal defendants the right to effective assistance of counsel.  *State v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017).  We review de novo an ineffective assistance of counsel claim.  *Id.*

To prevail on an ineffective assistance claim, the defendant must show both that (1) defense counsel's representation was deficient and (2) the deficient representation prejudiced him or her.  *Id*. at 457-58.  Representation is deficient if, after considering all the circumstances, it falls below an objective standard of reasonableness.  *Id*. at 458.  Prejudice exists if there is a reasonable probability that, except for counsel's error, the result of the proceeding would have been different.  *Id*.  It is not enough that ineffective assistance conceivably impacted the case's outcome; the defendant must affirmatively show prejudice.  *Id*.

We begin our analysis with a strong presumption that defense counsel's performance was reasonable.  *Id.*  Defense counsel's conduct is not deficient if it can be characterized as legitimate trial strategy or tactics.  *Id.*  To rebut the strong presumption that counsel's performance was effective, "the defendant bears the burden of establishing the absence of any 'conceivable legitimate tactic explaining counsel's performance.' "  *State v. Grier*, 171 Wn.2d 17, 42, 246 P.3d 1260 (2011) (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)).

Where counsel's failure to request a particular jury instruction is the basis for a claim of ineffective assistance, the defendant must show that he or she "was entitled to the instruction, counsel's performance was deficient in failing to request it, and the failure to request the instruction caused prejudice." *State v. Classen*, 4 Wn. App. 2d 520, 539-40, 422 P.3d 489 (2018).

### 2. Legitimate Trial Strategy

Even if Sarmiento was entitled to a defense of others instruction, the question here is whether defense counsel's failure to request such an instruction can be characterized as a legitimate trial strategy or tactic. *See Grier*, 171 Wn.2d at 42.

When a defendant is charged as an accomplice to a shooting, the primary defense often is that the defendant had no knowledge that a shooting would occur. Defense counsel proffered this defense. The theory was that Zuniga, a young, aggressive, and undisciplined gang member, had acted on his own during the shooting because he was eager to elevate his status within the gang. Defense counsel argued that Zuniga was high and intoxicated at the time of the shooting. Defense counsel also argued that Sarmiento was not an accomplice to Zuniga's actions because there was no plan between them to shoot anyone and that Zuniga acted purely on his own.

If defense counsel had requested a defense of others instruction, the jury might have inferred that Zuniga was acting at Sarmiento's request to defend him. Therefore, the instruction could have undermined Sarmiento's theory that Zuniga had acted alone and that Sarmiento had nothing to do with Zuniga's decision to shoot the victims. Given the strong presumption that defense counsel's performance was effective, we conclude that the decision not to request a defense of other instruction was a legitimate trial strategy.

12

Because Sarmiento cannot demonstrate that defense counsel's performance was deficient, we hold that Sarmiento's ineffective assistance of counsel claim on this basis fails.

C.      CUMULATIVE ERROR

Sarmiento argues that cumulative error denied him a fair trial.  Under the cumulative error doctrine, the defendant must show that the combined effect of multiple errors requires a new trial.  *State v. Clark*, 187 Wn.2d 641, 649, 389 P.3d 462 (2017).

Here, we have held that even if the trial court erred in denying Sarmiento's suppression motion, any error was harmless.  Therefore, the cumulative error doctrine is inapplicable.  *See State v. Yarbrough*, 151 Wn. App. 66, 98, 210 P.3d 1029 (2009).

D.      SUFFICIENCY OF THE EVIDENCE – POSSESSION OF FIREARM

Sarmiento argues that the State failed to present sufficient evidence of second degree unlawful possession of a firearm because it failed to establish that he had actual or constructive possession of a firearm.  We disagree.

1.    Legal Principles

The test for determining sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt.  *State v. Cardenas-Flores*, 189 Wn.2d 243, 265, 401 P.3d 19 (2017). In a sufficiency of the evidence claim, the defendant admits the truth of the evidence and the court views the evidence and all reasonable inferences drawn from that evidence in the light most favorable to the State.  *Id*. at 265-66.  Credibility determinations are made by the trier of fact and are not subject to review.  *Id*. at 266.  Circumstantial and direct evidence are equally reliable.  *Id*.

A person is guilty of unlawful possession of a firearm in the second degree if he knowingly has a firearm in his possession or control and he has previously been adjudicated guilty of a felony. RCW 9.41.040(2)(a); *State v. Anderson*, 141 Wn.2d 357, 360, 5 P.3d 1247 (2000). The trial court's to-convict instruction included these elements. Sarmiento stipulated that he previously had been adjudicated guilty as a juvenile of a felony offense and was not permitted by law to possess a firearm.

A person can have actual possession or constructive possession of an item. *State v. Reichert*, 158 Wn. App. 374, 390, 242 P.3d 44 (2010). Actual possession requires physical custody of the item. *Id.* Constructive possession occurs when a person has "dominion and control" over an item. *Id.* Although the defendant's ability to immediately take actual possession of an item can show dominion and control, mere proximity to the item by itself is insufficient. *State v. Davis*, 182 Wn.2d 222, 234, 340 P.3d 820 (2014). A person can have possession without exclusive control; more than one person can be in possession of the same item. *State v. George*, 146 Wn. App. 906, 920, 193 P.3d 693 (2008).

Whether sufficient evidence establishes that a defendant had dominion and control over an item depends on the totality of the circumstances. *State v. Lakotiy*, 151 Wn. App. 699, 714, 214 P.3d 181 (2009). Aspects of dominion and control include whether the defendant could immediately convert the item to his or her actual possession, *State v. Jones*, 146 Wn.2d 328, 333, 45 P.3d 1062 (2002); the defendant's physical proximity to the item, *State v. Chouinard*, 169 Wn. App. 895, 899, 282 P.3d 117 (2012); and whether the defendant had dominion and control over the premises where the item was located. *Reichert*, 158 Wn. App. at 390.

When a defendant has dominion and control of the premises, a rebuttable presumption arises that the defendant also has dominion and control over items within the premises. *Reichert*,

158 Wn. App. at 390. Courts have found sufficient evidence that a defendant had dominion and control an item in a vehicle when the defendant was driving a vehicle that he or she owns. *State v. Bowen*, 157 Wn. App. 821, 828, 239 P.3d 1114 (2010); *State v. Turner*, 103 Wn. App. 515, 524, 13 P.3d 234 (2000).

In *Bowen*, the defendant was the owner, driver, and sole occupant of a truck in which a firearm was located. 157 Wn. App. at 828. This court stated, "An individual's sole occupancy and possession of a vehicle's keys sufficiently supports a finding that the defendant had dominion and control over the vehicle's contents." *Id.* In *Turner*, the defendant was driving his truck with one passenger and a rifle was in the back seat. 103 Wn. App. at 521. The court noted that the defendant was "in close proximity to the rifle, knew of its presence, was able to reduce it to his possession, and had been driving the truck in which the rifle was found." *Id.* He also "knew that he was transporting the firearm and did nothing to remove it from his presence." *Id.* at 524. The court stated, "[W]here there is control of a vehicle and knowledge of a firearm inside it, there is a reasonable basis for knowing constructive possession, and there is sufficient evidence to go to the jury." *Id.*

2. Analysis

Consistent with the law stated above, the trial court instructed the jury as follows regarding the definition of "possession":

> Possession means having a firearm in one's custody or control. It may be either actual or constructive. Actual possession occurs when the item is in the actual physical custody of the person charged with possession. Constructive possession occurs when there is no actual physical possession but there is dominion and control over the item.
>
> Proximity alone without proof of dominion and control is insufficient to establish constructive possession. Dominion and control need not be exclusive to support a finding of constructive possession.

In deciding whether the defendant had dominion and control over an item, you are to consider all the relevant circumstances in the case. Factors that you may consider, among others, include whether the defendant had the immediate ability to take actual possession of the item, whether the defendant had the capacity to exclude others from possession of the item, and whether the defendant had dominion and control over the premises where the item was located. No single one of these factors necessarily controls your decision.

CP at 239. In addition, the to-convict instruction required that the jury find that Sarmiento had possession of a firearm on November 2, the day of the shooting.

The State argues that Sarmiento had constructive possession because the gun that Zuniga shot was in Sarmiento's truck, which he was driving, and he did nothing to remove it. Sarmiento argues that the State could not show that he had dominion and control over the firearm while it was in the truck because there was no evidence that Sarmiento knew Zuniga had the gun inside the truck or knew that Martinez brought the gun into the truck in the first place.

An essential element of the crime of unlawful possession of a firearm is knowing possession. *State v. Hartzell*, 156 Wn. App. 918, 944, 237 P.3d 928 (2010). But knowledge may be inferred when the defendant's conduct indicates the requisite knowledge is logically probable. *State v. Warfield*, 119 Wn. App. 871, 884, 80 P.3d 625 (2003).

Here, Sarmiento saw the gun at Gamez's house, regardless of whether he touched it. Zuniga testified that he, Sarmiento, and Martinez left Gamez's house with the gun in Sarmiento's truck. When Martinez gave Zuniga the gun at a stop, Sarmiento told Zuniga "Don't be worried," "Don't be afraid," and "Be ready." 14 RP at 1913. Zuniga testified that Sarmiento saw him with the gun in his hands sometime that night. This evidence supports a reasonable inference that Sarmiento knew that the gun was in his truck.

Sarmiento points out that the cases that find sufficient evidence of possession based on a defendant driving a vehicle in which a firearm was located all involved situations where the

firearm was not in anyone's actual possession. *Bowen*, 157 Wn. App. at 828 (firearm in bag next to driver's seat); *Turner*, 103 Wn. App. at 518 (firearm in back seat). Here, the gun was not simply loose in the truck; it was actually possessed by Martinez and then Zuniga. But as the court instructed the jury here, "whether the defendant had dominion and control over the premises where the item was located" was a factor that the jury could consider and "[d]ominion and control need not be exclusive to support a finding of constructive possession." CP at 239. The instruction did not state that a third party's actual possession of the gun precluded a finding of constructive possession.

We hold that the evidence was sufficient to prove that Sarmiento had constructive possession of the firearm.

E.      SAG CLAIMS

1.      Challenges to Warrants

Sarmiento asserts that the use of the term "co-conspirators" in the HTC and LG phone warrant was overbroad because RCW 9A.32.030 (the first degree murder statute) does not contain the term "co-conspirator" and the term allowed law enforcement to broaden their search to items for which there was no probable cause. He also asserts that the temporal limitations on some of the search warrants did not cure the warrants' overbreadth because the date limitations were not relevant to the crimes under investigation.

But we held above that even if the warrants were invalid, any error was harmless. Therefore, we reject these assertions.

2.      Double Jeopardy

Sarmiento asserts that his convictions for second degree felony murder and first degree manslaughter violate the Fifth Amendment's prohibition on double jeopardy.

17

However, at sentencing the trial court vacated the first degree manslaughter conviction. Sarmiento's judgment and sentence states that he was convicted of only one count of second degree murder under RCW 9A.32.050(1)(b). Therefore, we conclude that there was no violation of double jeopardy.

CONCLUSION

We affirm Sarmiento's convictions.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
MAXA, J.

We concur:

_____
LEE, C.J.

_____
CRUSER, J.