IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 80460-0-I |
| | ) | |
| Respondent, | ) | UNPUBLISHED OPINION |
| | ) | |
| v. | ) | |
| | ) | |
| L.L.B., | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

ANDRUS, A.C.J. – L.L.B. appeals his conviction for third-degree rape of his 14 year-old cousin, J.B. L.L.B. claims his counsel was unable to meaningfully cross-examine J.B. because the prosecutor repeatedly interrupted the cross-examination. The record, however, does not support this claim. We conclude L.L.B. received a fair trial and affirm.

## FACTS

In the summer of 2017, 17-year-old L.L.B. lived with his mother, Gloria,[1] at her home in Federal Way, with her two other children. Gloria has a large, extended family, including 13 siblings and approximately 30 nieces and nephews. Gloria regularly hosted her nieces, J.B. and C.B., for sleepovers in her home. J.B. and

---

[1] This opinion refers to the adult parties by their first names only to protect the identities of the minors involved. We mean no disrespect.

C.B., then 13 and 14-years-old, respectively, usually slept in Gloria's room, in Gloria's daughter's room, or in the living room.

On August 1, 2017, J.B.'s 14th birthday, J.B., C.B., and C.B.'s teenage aunt, M.A., slept over at Gloria's home. The girls wanted to watch a television show in bed, so they decided to sleep in L.L.B.'s bedroom, which had two twin beds. C.B. and M.A. planned to share one twin bed, sleeping head to toe, while J.B. and L.L.B. would do the same in the other bed. L.L.B. agreed to this sleeping arrangement. L.L.B. was in his bed, facing the wall, when J.B. laid down on the bed next to him. The three girls continued to watch television with the bedroom lights off while also looking at their phones.

At some point, L.L.B. turned over, pulled down J.B.'s shorts, and inserted his penis into her anus. J.B. told L.L.B. to stop multiple times and pulled away from him. L.L.B. then touched J.B.'s leg with his penis and tried to touch her vagina. J.B. pushed his hand away. Shocked and surprised, J.B. began to cry silently to herself. While holding her shorts up with one hand to prevent L.L.B. from pulling them down again, J.B. used her other hand to send C.B. a text message via Snapchat, telling her that L.L.B. was "literally raping" her, that she did not want to sleep with him, and that she did not want to say anything out loud because J.B. was scared. C.B. received this message at 11:50 p.m. on August 1.

As a ruse, C.B. asked J.B. to come with her to the living room. Both girls started crying as J.B. recounted what had occurred. C.B. attempted to comfort J.B. and told her she should report the behavior to adults. The girls then slept the

rest of the night on separate couches in the living room. The following day, C.B. described J.B. as not her typical self, spaced out, and "in her own mood."

On August 19, 2017, at the urging of other close female family members, J.B. sent a text message to her mother, Kamaria, telling her about the sexual assault. J.B. did not disclose the assault to Kamaria immediately after the event, fearing the revelation would tear the large, close-knit family apart. Kamaria immediately took J.B. to Mary Bridge Children's Hospital, where she was examined by the on-call physician, Dr. Grant Keeney. J.B. was also interviewed by a social worker, Lori Jensen, who contacted law enforcement. Officer Luis Deffit interviewed J.B. at the hospital, took a written statement from her, took photos of J.B.'s cell phone and Snapchat message to C.B., and collected the phone as evidence.

The State charged L.L.B. with third-degree rape. The trial court held a bench trial in February 2019. The court heard the testimony of J.B., C.B., Gloria, Kamaria, Officer Deffit, Dr. Keeney,[2] Jensen, and L.L.B.

L.L.B. corroborated most of C.B.'s and J.B.'s testimony but denied having any sexual contact with J.B. He testified he never turned toward J.B., and simply fell asleep after she laid down on his bed. His defense thus focused on J.B.'s credibility. L.L.B. argued at trial that J.B. had given different and inconsistent stories regarding events on the night of the rape, that her version at trial was

---

[2] Dr. Keeney, a provider at Mary Bridge Children's Hospital, testified in his capacity as J.B.'s treating physician when Kamaria brought her in to the hospital on August 19. Dr. Keeney also testified as a pediatric concussion expert, interpreting the medical records relating to J.B.'s December 2018 concussion and opining that it was plausible that J.B. was suffering from memory loss as a result of the concussion during the December 2018 defense interview.

contradicted by other evidence, and that the story was simply implausible. Defense counsel in particular focused on statements J.B. made during a December 2018 defense interview. L.L.B. argued that during this interview, J.B. said she had been assaulted in July 2017, in the presence of cousins in town from Mississippi, rather than on the night of her birthday in C.B.'s presence and that L.L.B. had "tried" but had not actually achieved sexual penetration on the night she was in L.L.B.'s bed, statements inconsistent with her trial testimony.

Defense counsel further argued that had J.B. fought off L.L.B.'s sexual advances and verbally told him to stop, it would have been impossible for the two girls lying on the twin bed in such close proximity to have heard and seen nothing. And he pointed to C.B.'s testimony that she never saw L.L.B. facing J.B., as J.B. testified. According to a diagram C.B. drew during her interview, she saw L.L.B. lying on his left side facing away from J.B., and she observed J.B. lying on her right side with her back to L.L.B. Finally, defense counsel questioned J.B.'s reasoning for waiting so long to tell any adult about the rape.

L.L.B.'s appeal is based on two instances during the cross-examination of J.B., where the prosecutor interjected a comment to the court or spoke directly to J.B. During the first instance, defense counsel asked J.B. if statements she provided during the defense interview were "significantly different" from the version of events J.B. recounted during trial. When J.B. admitted her testimony differed from what she said during that interview, the prosecutor interjected, telling the court that J.B. may be confused as to the question. It appears the prosecutor started to address J.B. with the words "Could you . . . ," but was cut off by a defense objection.

Defense counsel asked the court to instruct the prosecutor not to communicate with J.B. during cross examination. At that point, J.B. asked for a break, and the court called for a recess. Defense counsel objected to the recess, and the prosecutor assured defense counsel and the court that she would not speak with J.B. about the case during the recess. The court overruled the objection and took a recess.

When testimony resumed, J.B. asked the court if she could explain the response she had given to defense counsel's question. The court granted J.B.'s request, at which time she explained that days before the interview, she had sustained a concussion and could not remember details very well at the time.

This statement was not a surprise to defense counsel, the prosecution, or the court. During J.B.'s direct examination, the prosecutor elicited testimony from J.B. that she had been interviewed by L.L.B.'s attorney around Christmas 2018 within days of having been "jumped" and sustaining a concussion. J.B. testified that during the defense interview, she had been nauseous, had a headache, did not eat, and could not recall details very well. She admitted she did not disclose her condition to either the prosecutor or defense counsel but told a victim advocate after the interview.

Defense counsel objected to J.B.'s testimony because it was not a part of the pending question and moved to strike J.B.'s answer. The court overruled the objection.

During this exchange, the prosecutor noted for the record that during the recess, she had instructed J.B. to "just listen to the question and answer yes or no"

and to ask the court if J.B. was confused. Defense counsel did not raise any concerns about this communication between prosecutor and witness.

The second instance occurred when defense counsel asked J.B. whether she remembered being asked, during her defense interview, about where she mainly lived during the summer of 2017. J.B. stated she did not recall being asked that question. Defense counsel then asked if she saw the question written down in the interview transcript. Although it is not completely clear what happened at that stage, it appears J.B. was unable to locate the question in her copy of the transcript. The prosecutor walked toward J.B., at which time defense counsel asked the court to instruct the prosecutor not to approach J.B. during her testimony. The prosecutor explained that she was not trying to point anything out to J.B. but was merely trying to confirm that J.B. was looking at the correct page. The prosecutor informed the court that J.B. was reading the wrong page.

The court suggested to defense counsel that because witnesses are not as familiar with the transcripts as counsel was, it would be appropriate to help J.B. find the page to which counsel was referring. Defense counsel agreed to approach and point out the correct page. The court further noted that "going forward, I don't . . . see an issue . . . with [the prosecutor] assisting just with the exhibits. Just identifying the place that you're . . . pointing to. Is that okay?" Defense counsel agreed as long as there was no communication between J.B. and the prosecutor. The court thereafter allowed the prosecutor to help J.B. find the text defense counsel was pointing out, "in the interest of efficiency." Defense counsel raised no further objections.

On March 14, 2019, the court delivered its oral findings of fact and conclusions of law. It found the evidence established that L.L.B. was guilty of third degree rape. The court explicitly found J.B.'s testimony to be "clear, direct, respectful, credible, and consistent with all the remaining evidence." The trial court directly addressed several of defense counsel's attacks on J.B.'s credibility, including finding that the discrepancies between J.B.'s trial testimony and her defense interview were either immaterial or could be explained by the fact that J.B. had sustained a concussion around the time of the defense interview. The court found J.B. credible about not being able to recall details during that interview as a result of the concussion.

The court rejected L.L.B.'s argument that it was implausible that the two teenage girls in the bedroom had not heard J.B. asking L.L.B. to stop. He found they were engrossed in their cell phones, stating "I can't overestimate the ability of teenagers to concentrate on their phones." He also rejected L.L.B.'s contention that it was implausible to believe that J.B. could type a text with one hand while holding her shorts in her other hand, finding "it plausible that a fourteen year-old girl would not know how to react to this and seek to test her best friend and cousin. I found it plausible that she typed out with one hand while holding onto her pants with the other." The court specifically stated that J.B. "was direct, strong, and brave in her testimony. She was not evasive. She was patient even under difficult cross examination. And even involving a very difficult topic." Finally, the court had no evidence that either J.B. or C.B. had any bias or prejudice against L.L.B.

In written findings dated April 16, 2019, the court reiterated its credibility determinations as to J.B. The court sentenced L.L.B. to 30 days in detention with 30 days of credit served.

ANALYSIS

L.L.B. argues on appeal that he was denied his right to meaningfully cross-examine J.B. L.L.B. maintains that by assisting J.B. while on the stand, the prosecutor interfered with the defense's ability to challenge J.B.'s memory and credibility.

The right to confront and cross-examine adverse witnesses is guaranteed by both the federal and state constitutions. U.S. Const. amend. VI; Wash. Const. art. I, § 22. "The primary and most important component is the right to conduct a meaningful cross-examination of adverse witnesses." State v. Darden, 145 Wn.2d 612, 620, 41 P.3d 1189 (2002). "The purpose is to test the perception, memory, and credibility of witnesses." Id. "The confrontation clause is normally satisfied 'if defense counsel receives wide latitude at trial to question witnesses.'" State v. Dye, 170 Wn. App. 340, 346, 283 P.3d 1130 (2012) (quoting Pennsylvania v. Ritchie, 480 U.S. 39, 53, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987)). The scope of the cross-examination, however, is within the discretion of the trial court and will not be disturbed absent manifest abuse of discretion. State v. Young, 89 Wn.2d 613, 628, 574 P.2d 1171 (1978).

L.L.B. contends that after J.B. admitted her defense interview answers were "significantly different" from her trial testimony, the prosecutor improperly interrupted the cross-examination, giving J.B. an opportunity to explain why these

inconsistencies existed. But L.L.B. provides no case law to support his argument that this single interruption implicates his right to cross-examine a witness.

The record indicates L.L.B. was given wide latitude to question J.B. and the prosecutor's interruption did not impede this cross examination in any way. J.B. had already explained, during her direct examination, that she had sustained a concussion before the defense interview and that this injury had affected her recall. Defense counsel directly challenged J.B.'s testimony that her concussion caused memory lapses. J.B. acknowledged on cross examination that she had not revealed the concussion to defense counsel at the time of the interview. And counsel elicited testimony from J.B.'s mother, Kamaria, that she noticed no changes in J.B.'s memory after she sustained the concussion.

Additionally, L.L.B. was able to thoroughly challenge J.B.'s testimony regarding the rape. Defense counsel spent a significant amount of time—both before and after the prosecutor's intervention—questioning J.B. about discrepancies in statements she made about that night. For example, J.B. conceded she had told counsel in her interview that L.L.B. had sexually assaulted her in July when her cousins from Mississippi were present. J.B. also admitted she told counsel that L.L.B. touched her inappropriately while she was sitting in a chair beside the bed, not when she was on his bed. And as to her trial testimony that L.L.B. had penetrated her with his penis, J.B. admitted that during the defense interview, she stated that she "felt it try to push in, but it didn't."

The record does not support L.L.B.'s argument that the prosecutor's interruption prevented defense counsel from thoroughly cross-examining J.B. and challenging her memory or credibility.

L.L.B. next contends the prosecutor impermissibly "coached" J.B. during the recess by telling her to answer defense counsel's questions with a "yes" or a "no." He argues this limited the amount of information defense counsel could elicit from her. We reject this argument as well.

Although the State may not urge a witness to create testimony, State v. McCreven, 170 Wn. App. 444, 475, 284 P.3d 793 (2012), a prosecutor is not prohibited from talking to witnesses during a trial recess. State v. Delarosa-Flores, 59 Wn. App. 514, 516, 799 P.2d 736 (1990). Generally, the party alleging some type of prosecutorial misconduct bears the burden of showing the challenged conduct was improper. State v. Emery, 174 Wn.2d 741, 759, 278 P.3d 653 (2012).

L.L.B. has not met the burden of showing that the prosecutor's statement to J.B. was improper or that she impermissibly coached J.B. in any way. The prosecutor advised both the court and defense counsel that she had instructed J.B. to listen carefully to defense counsel's questions and to answer "yes" or "no" to them. Defense counsel did not suggest to the trial court that this instruction constituted impermissible witness coaching. The prosecutor's comment was understandable given that the vast majority of L.L.B.'s cross examination was designed to elicit a yes-or-no response. In fact, defense counsel objected when the court permitted J.B. to elaborate; he did not contend that J.B. refused to answer fully.

There is nothing to suggest the prosecutor told J.B. to create or alter her testimony. Nor is there any evidence the prosecutor instructed J.B. on the substance of her testimony or used the recess to urge J.B. to explain the discrepancies between her defense interview and her trial testimony. J.B. did not refuse to answer any question posed by defense counsel.

L.L.B. next asserts that the prosecutor impermissibly assisted J.B. by locating statements J.B. made during the defense interview. Not only is this argument unsupported by the record, but this assistance occurred at the request of the trial court. The court asked defense counsel and the prosecutor to help J.B. find statements in the transcript for the sake of efficiency. Defense counsel agreed to this approach. Trial courts have wide discretion to allow counsel to approach a witness to direct the witness's attention to some particular passage in a document to facilitate questioning. We can see no abuse of discretion here.

Finally, even if some interference occurred, we cannot see how any of the prosecutor's statements or actions impacted the outcome of this trial. A violation of a defendant's right to cross examine a witness is subject to a harmless error analysis. State v. Turnipseed, 162 Wn. App. 60, 70, 255 P.3d 843 (2011). An error is harmless if the reviewing court finds beyond a reasonable doubt that the verdict would have been the same without the error. State v. Romero-Ochoa, 193 Wn.2d 341, 347, 440 P.3d 994 (2019). In making this determination, we consider whether any violation was insignificant and to what extent cross examination was otherwise permitted. State v. Vincent, 131 Wn. App. 147, 154-55, 120 P.3d 120 (2005).

Here, there was absolutely no material limit on L.L.B.'s cross examination of J.B. and any violation was insignificant. L.L.B. was not prevented from asking any questions, and he has no evidence that any answers were coached or perjured. L.L.B. was not prevented from challenging J.B.'s credibility or veracity and there is no indication the State bolstered J.B.'s testimony in any way.

Ultimately, the trial court found J.B. credible despite defense counsel's "rightful attempts" to impeach her. We have no reason to suspect that the trial court's credibility finding would have been any different had the prosecutor not spoken up or assisted J.B. in finding particular statements in the interview transcript during cross examination.

We thus reject L.L.B.'s argument that the prosecutor interfered with his cross-examination of J.B. L.L.B. had the opportunity to confront J.B. and received a fair trial.[3]

## Statement of Additional Grounds for Review

L.L.B. argues the trial court speculated that C.B. and M.A. did not hear L.L.B. sexually assault J.B. because the television volume was too loud. The trial court, however, did not find that the television sound was so high that it precluded C.B. and M.A. from overhearing J.B. and L.L.B. The trial court merely found that the television was loud enough to be heard throughout the bedroom. This finding is supported by the record. C.B. testified the television was on and the volume was loud enough for her to hear it where she was lying. L.L.B. also testified the

---

[3] L.L.B. also challenges the trial court's credibility determination as to J.B. But these determinations are not reviewable on appeal. See In re Davis, 152 Wn.2d 647, 680, 101 P.3d 1 (2004) ("A trial court's credibility determinations cannot be reviewed on appeal, even to the extent there may be other reasonable interpretations of the evidence.").

volume was loud enough for him to hear. The trial court's finding to this effect was not based on speculation.

L.L.B. next contends the trial court improperly compared J.B. to his own daughter, demonstrating bias against L.L.B. But L.L.B. provides no citation to the record as to when this alleged statement occurred. The only reference to the trial court's daughter occurred during J.B.'s testimony, when the prosecutor asked J.B. to define a "Snapchat streak." J.B. had difficulty explaining this concept, prompting the trial court to say "I'm very familiar with streaks . . . My daughter has Snapchat, so." The trial court was not comparing J.B. with his own teenage daughter; he merely indicated the parties did not need to further define a "Snapchat streak" because he had a basic familiarity with the concept. We can find no other reference to the court's family in the record before us. We thus reject L.L.B.'s argument that bias affected the outcome of his trial.

Affirmed.

_Andrus, A.C.J._

WE CONCUR: