THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 81504-1-I |
| Respondent, | |
| | DIVISION ONE |
| v. | |
| | UNPUBLISHED OPINION |
| TONY JOSEPH WILLIAMS, | |
| Appellant. | |

ANDRUS, A.C.J. — Tony Williams appeals his convictions for attempted first degree robbery and first degree assault following the 2018 shooting of Wade Clute. He argues that attempted first degree robbery is an alternative means crime and that insufficient evidence supports his conviction on each of the three alternative means. He further argues that the trial court denied him the constitutional right to present a defense when it precluded cross examination of a police witness on instances of past misconduct and that it erred in concluding that the assault and attempted robbery crimes did not constitute the same criminal conduct. We affirm his conviction and sentence except for the imposition of community custody fees. We remand to strike that fee from Williams's judgment and sentence.

## FACTS

Tony Williams and Nicholas Naylor devised a plan to rob Wade Clute at a Brown Bear car wash in Lynnwood, Washington, in the early hours of August 5,

2018. Naylor's friend, Amy Chavez, told Naylor that her drug dealer, Clute, carried large quantities of cash and heroin and did not carry a gun. Naylor asked Chavez to call Clute pretending she wanted to buy drugs and Naylor and Williams planned to subdue Clute with an electric stun device and take his drugs and money.

Naylor drove Williams to the car wash in a maroon or burnt orange PT Cruiser. While Clute was washing his car, Williams, wearing a black hoodie, hat, and sunglasses, approached and attempted to stun him. Clute wrestled the stun gun from Williams, got into his car, and started to drive off. Williams retreated a few steps, pulled a gun, and fired one shot at Clute's car. The bullet pierced the back window, passed through Clute's headrest, and struck him in the neck, severing his spinal cord. Clute lost control and his car ran up and over an embankment and struck an adjacent building.

Williams and Naylor fled the scene in the PT Cruiser and parked in a nearby residential neighborhood. Williams abandoned his black hoodie, hat, and gloves in a nearby yard. Naylor called Chavez to pick them up and they abandoned the vehicle. Naylor did not realize he left his temporary driver's license inside the car.

Police and paramedics arrived at the scene of the shooting and transported Clute to Harborview Medical Center where he underwent surgery to remove the bullet from his spine. The gunshot wound paralyzed Clute from the neck down.

Responding officers and detectives from the Snohomish County Sherriff's Office recovered footage from the car wash's security camera and a purple Smith and Wesson .40 caliber bullet casing from the ground. They also located the PT Cruiser and Williams's abandoned clothing the next day. Officers collected

fingerprints from the vehicle and found Naylor's driver's license. They arrested Naylor in Lynnwood on September 3, 2018, after confirming Naylor's fingerprints were inside the PT Cruiser.

Williams initially came to law enforcement's attention when he made jail video calls to Naylor. In December 2018, investigators received the results of DNA tests linking Williams to the clothing abandoned near the PT Cruiser. Police arrested Williams on December 6, 2018, while he was riding in the passenger seat of his wife's Jeep. A search of the Jeep produced a handgun, various rounds of ammunition, including purple Smith and Wesson .40 caliber bullets and a magazine for a .40 caliber semi-automatic pistol loaded with the same bullets.

The State charged Williams with first degree assault with a firearm, attempted first degree robbery with a firearm, and two counts of first degree unlawful possession of a firearm. One of the firearm possession charges related to the handgun police discovered in Williams's Jeep when he was arrested in December 2018. Before trial, the court severed that count from the remaining charges and Williams later pleaded guilty to that charge.[1]

Naylor subsequently agreed to testify against Williams in exchange for a plea deal. Although originally charged with first degree assault, Naylor pleaded guilty to second degree robbery and second degree unlawful possession of a firearm. He testified at Williams's trial and described how the two had planned the robbery. He said he did not know that Williams had a gun until after the incident

---

[1] Information about his possession of a handgun in December 2018 was excluded at trial because the police confirmed the gun was not the one used to shoot Clute and the court severed that count.

and, after the shooting, Williams told him Clute had a gun[2] and he fired his gun at Clute as a "warning shot."

A jury convicted Williams as charged. The jury also returned special verdicts finding that Williams committed the assault and attempted robbery with a firearm.

At sentencing, Williams argued the attempted robbery and assault constituted the same criminal conduct thereby lowering his offender score. The trial court rejected Williams's argument, concluding that the shooting was more indicative of a revenge act rather than a continuing course of conduct. The trial court sentenced Williams to a total prison term of 428 months and 54 months of community custody.[3]

## ANALYSIS

A.    Jury Unanimity

Williams first argues that the State violated his right to jury unanimity by failing to present sufficient evidence of each alternative means of committing attempted robbery in the first degree. We reject this claim under the invited error doctrine.

Under article I, section 21 of the Washington Constitution, criminal defendants have a right to a unanimous jury verdict. "This right may also include the right to a unanimous jury determination as to the means by which the defendant committed the crime when the defendant is charged with (and the jury is instructed

---

[2] Police found no weapon in Clute's car. Clute testified he had no firearm in his possession that night. Williams did not raise self-defense at trial.

[3] The court sentenced Williams to 236 months on Count 1, with a 120-month firearm enhancement, and 48 months on Counts 2, 3 and 4, with a 72-month firearm enhancement on Count 2.

on) an alternative means crime." State v. Owens, 180 Wn.2d 90, 95, 323 P.3d 1030 (2014). "In reviewing this type of challenge, courts apply the rule that when there is sufficient evidence to support each of the alternative means of committing the crime, express jury unanimity as to which means is not required. If, however, there is insufficient evidence to support any means, a particularized expression of jury unanimity is required." Id.

The court instructed the jury that to convict Williams of attempted first degree robbery, the State had to prove the following elements beyond a reasonable doubt: (1) that on or about the 5th day of August, 2018, the defendant did an act that was a substantial step toward the commission of first degree robbery; (2) that the act was done with the intent to commit first degree robbery; and (3) that the act occurred in the State of Washington. Instruction 18 provided the jury with the elements of first degree robbery: "A person commits the crime of robbery in the first degree when in the commission of a robbery or in immediate flight therefrom he is armed with a deadly weapon or displays what appears to be a firearm or other deadly weapon or inflicts bodily injury." This instruction contained all three of the alternative means of committing first degree robbery set out in RCW 9A.56.200(1)(a).

Williams concedes that substantial evidence supports his conviction under the "inflicts bodily injury" alternative, but argues the State failed to prove he took a substantial step toward committing first degree robbery while "armed with a deadly weapon" or "display[ing] what appeared to be a firearm or other deadly weapon." Even if attempted first degree robbery is an alternative means crime—by no means

clearly established under the law—Williams's argument fails because he invited the error by proposing an instruction identical to instruction 18.

The invited error doctrine applies to unanimity instructions. State v. Carson, 179 Wn. App. 961, 973, 320 P.3d 185 (2014), aff'd, 184 Wn.2d 207, 357 P.3d 1064 (2015). Specifically, where a defendant's proposed instructions do not include a unanimity instruction, the invited error doctrine precludes the defendant from appealing the trial court's failure to give such an instruction. State v. Corbett, 158 Wn. App, 576, 591-92, 242 P.3d 52 (2010). See also State v. Holt, 119 Wn. App. 712, 718, 82 P.3d 688 (2004), disapproved of on other grounds by State v. Barboza-Cortes, 194 Wn.2d 639, 451 P.3d 707 (2019) (applying invited error in the context of a unanimity challenge to an alternative means crime).

Williams argues that the invited error doctrine does not apply because he is challenging the sufficiency of the evidence, not the jury instructions themselves. But he specifically contends the jury instructions failed to ensure his constitutional right to jury unanimity. This court has repeatedly held that the invited error doctrine bars a defendant from raising a jury unanimity argument based on instructions the defendant proposed. See State v. Winings, 126 Wn. App. 75, 89, 107 P.3d 141 (2005) (defendant invited error of assault "to convict" instruction by offering instruction that included attempted battery as alternative means of committing assault).

Instruction 18 is identical to the defense's proposed instruction 13 and is taken from WPIC 37.01. WPIC 37.01 states:

> A person commits the crime of robbery in the first degree when in the commission of a robbery [or in immediate flight therefrom] he or she

[is armed with a deadly weapon] [or] [displays what appears to be a firearm or other deadly weapon] [or] [inflicts bodily injury] [or] [commits a robbery within and against a financial institution].

11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 37.01, at 772 (5th ed. 2021). The "Note on Use" to this instruction states: "Use bracketed material as applicable." Id.

Williams proposed an instruction that included the bracketed language for all three alternative means: "is armed with a deadly weapon, or displays what appears to be a firearm or inflicts bodily injury." By doing so, he tacitly agreed there was sufficient evidence as to each of these means to submit the issue to the jury. He did not argue below that the evidence was insufficient to instruct the jury on any of these alternative means and thus invited the error of which he now complains.

Williams argues that invited error does not apply under our Supreme Court's decision in State v. Hickman, 135 Wn.2d 97, 954 P.2d 900 (1998), but that case is inapposite. In Hickman, both parties agreed to the "to convict" jury instructions that included the element that the charged crime of insurance fraud occurred in Snohomish County. Id. at 101. On appeal, Hickman argued that the State failed to offer evidence that the crime occurred in Snohomish County. Id. The Supreme Court held that under the law of the case doctrine, the instructions added a venue element and Hickman could challenge the sufficiency of evidence of this element. Id. at 104-05. The case contains no discussion of invited error and does not support Williams's contention that he may raise a jury unanimity issue on appeal

where he proposed the relevant "to convict" instruction. The invited error doctrine thus bars Williams's jury unanimity claim.

B.      Same Criminal Conduct

Williams next argues that the trial court erred when it declined to treat his convictions for first degree assault and attempted first degree robbery as the same criminal conduct. We disagree.

We review a trial court's ruling on whether multiple offenses constitute the same criminal conduct for an abuse of discretion or misapplication of the law. State v. Latham, 3 Wn. App. 2d 468, 479, 416 P.3d 725 (2018).

"Same criminal conduct" means "two or more crimes that require the same criminal intent, are committed at the same time and place, and involve the same victim." RCW 9.94A.589(1)(a). The defendant bears the burden of establishing that his convictions amount to the same criminal conduct, and if any element is missing, the sentencing court must count the offenses separately. State v. Aldana Graciano, 176 Wn.2d 531, 540, 295 P.3d 219 (2013). We construe RCW 9.94A.589(1)(a) narrowly to reject most assertions of same criminal conduct. Id. To determine if two crimes share a criminal intent, we focus on whether the defendant's intent, viewed objectively, changed from one crime to the next. State v. Dunaway, 109 Wn.2d 207, 215, 743 P.2d 1237 (1987).

The trial court ruled that the two crimes did not constitute the same criminal conduct because they involved different intents and occurred at different times:

> Mr. Clute entered his vehicle and was leaving the scene of the attempted scene of the robbery when Mr. Williams steps back into view, positions himself behind the car, raises his weapon, aims it and physically and purposefully fires the gun. It shatters the window of

the vehicle, strikes Mr. Clute causing immediate and irreparable serious bodily injury. Much like the Grantham case cited by the State, the evidence reflects one criminal act, the attempted robbery before the second began, the assault 1. Mr. Williams ran from the scene after Mr. Clute defended himself. Seconds passed. It is after Mr. Clute has entered his car and is driving away that Mr. Williams returns to view and assaults Mr. Clute by shooting at him. The second act was in furtherance of the first. Mr. Williams' behavior is far more consistent with a person returning to a scene to exact revenge with a final word, this became his gun to speak for him.

The trial court's reliance on State v. Grantham, 84 Wn. App. 854, 932 P.2d 657 (1997), was reasonable. In that case, the defendant was charged and convicted of two counts of second degree rape. On appeal, Grantham argued that the two rapes constituted the same criminal conduct. Division Two recognized that, as is the case here, "the crimes were committed against the same victim, at the same place, but not simultaneously, although relatively close in time." Id. at 858.

Thus, the question is whether the combined evidence of a gap in time between the two rapes and the activities and communications that took place during that gap in time, and the different methods of committing the two rapes, is sufficient to support a finding that the crimes did not occur at the same time and that Grantham formed a new criminal intent when he committed the second rape.

Id. The court went on to conclude that

[t]he trial court heard evidence that Grantham completed the first rape before commencing the second; that after the first and before the second he had the presence of mind to threaten L.S. not to tell; that in between the two crimes L.S. begged him to stop and to take her home; and that Grantham had to use new physical force to obtain sufficient compliance to accomplish the second rape.

Id. at 859.

In this case, as reflected by its oral ruling, the trial court also based its conclusion on evidence that Williams retreated from the crime of attempted robbery before commencing a new crime and intended to inflict physical injury on

Clute. The surveillance video footage and Naylor's testimony provided the court with sufficient evidence to conclude that Williams had time in between the two crimes to reflect and form a new criminal intent.

Williams argues that Grantham is distinguishable because he had not completed the attempted robbery when he shot Clute. He asserts that under Washington's transactional view of robbery, his crime was not complete until he escaped, citing State v. Handburgh, 119 Wn.2d 284, 290, 830 P.2d 641 (1992). We reject this argument because even if Williams's crime of attempted robbery continued through his flight from the scene, that does not mean he could not form the intent to commit a different crime in the process of his escape.

Washington courts have repeatedly rejected the argument that whenever a perpetrator commits new crimes during the course of an ongoing robbery, those crimes must be the same criminal conduct. See State v. Freeman, 118 Wn. App. 365, 377, 76 P.3d 732 (2003) (where defendant shot victim during robbery, his conviction for first degree robbery and first degree assault did not constitute the same criminal conduct); State v. Tanberg, 121 Wn. App. 134, 87 P.3d 788 (2004) (where defendant physically attacked victim and took her purse, his conviction for second degree assault did not merge with his conviction for first degree robbery).

The Freeman case is particularly instructive. There, the defendant demanded the victim's property at gunpoint. When the victim hesitated, the defendant shot him. The defendant threatened him again, and the victim handed over his property. 118 Wn. App. at 367-69. On appeal, this court upheld the trial court's conclusion that Freeman's resulting convictions for first degree assault and

first degree robbery did not constitute the same criminal conduct. Id. at 378-79. The court reasoned that the evidence was sufficient to support the trial court's finding that the shooting went "far beyond what was necessary to merely further the robbery." Id. at 378. The court noted that objectively, the intent for the two crimes differed and "[t]he trial court was not legally bound to accept Freeman's self-serving depiction of his subjective intent merely to further the robbery." Id.

The same can be said of this case. Regardless whether the attempted robbery was ongoing when Williams shot Clute, the evidence at trial was sufficient to persuade a rational trier of fact that the shooting was a gratuitous use of violent force, far beyond what was required to accomplish the intended robbery. We affirm the trial court's ruling that the crimes did not constitute the same criminal conduct.

C.     Right to Present a Defense

Williams next argues that the trial court's exclusion of evidence relating to the lead detective violated his right to present a defense and confront witnesses. We reject this argument as well.

Prior to trial, the State provided the defense with a "potential impeachment disclosure memorandum" concerning Detective Fontenot, chief investigator in Williams's case. The impeachment disclosure stated:

> On January 10, 2014, [the Snohomish County Prosecuting Attorney's Office] made a determination that certain information, if heard by a reasonable person (such as a judge or a juror), could lead that person to conclude that Deputy David Fontenot was dishonest in the performance of his official duties.
>
> In May of 2005 while a sergeant with the Clallam County Sheriff's Office, Deputy Dave Fontenot signed a return of service on a seizure notice that had not yet been served. He had instructed a fellow deputy to serve it earlier that day, and may well have believed that it

had been served. Nonetheless, it had not, so what he attested to by signing the return was untrue. No property was lost, and the other deputy served the notice the next morning. A reasonable person could conclude that what Fontenot wrote was untruthful, though his explanation is plausible.

Williams also obtained documents through a public disclosure request regarding the circumstances leading to Detective Fontenot's resignation from the Clallam County Sheriff's Office. The documents included a confidential questionnaire submitted to the Snohomish County Sheriff's Office in response to Detective Fontenot's application with that agency. The responding Chief Criminal Deputy from Clallam County Sheriff's Office indicated that Detective Fontenot had been "forced to resign" from the agency. He stated that Detective Fontenot "became embroiled in an internal investigation within this agency involving the unapproved possession of evidence and the filing of a notary document." According to personnel records, the Clallam County Sheriff's Office investigated allegations that Detective Fontenot had taken a pair of antique aviator goggles from a storage facility without logging them into evidence and signed an affidavit that he had served a seizure notice when he did not do so. He was given a two week suspension for violating department policy and placed on a six month period of performance monitoring. The Sheriff's Department later investigated Detective Fontenot for allegations of sexual harassment. An external investigator concluded that "Fontenot was engaged in behavior in the workplace that was at least unprofessional and inappropriate," and found the allegations substantiated.

Williams sought to admit this evidence and cross-examine Detective Fontenot about these incidents on the basis that the evidence was relevant to Detective Fontenot's untruthfulness under ER 608(b). The trial court prohibited

this line of questioning, concluding that the instances went to a collateral issue and were too remote in time to be probative of Detective Fontenot's truthfulness. Williams contends on appeal that this evidentiary ruling violated his right to present a complete defense.

In analyzing whether a trial court's evidentiary decision violated a defendant's Sixth Amendment right to present a defense, we first review the court's evidentiary ruling for abuse of discretion. State v. Jennings, no. 99337-8, slip op. at *4 (Wash. Feb. 3, 2022)[4] (citing State v. Arndt, 194 Wn.2d 784, 798-812, 453 P.3d 696 (2019)). If we conclude that the evidentiary ruling was not an abuse of discretion, we then consider de novo whether the exclusion of evidence violated the defendant's constitutional right to present a defense. Id.

1.      ER 608(b)

Williams contends the trial court abused its discretion in finding that the excluded evidence was irrelevant and of low probative value. ER 608(b) provides:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility . . . may . . . in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

Generally, evidence is relevant to attack a witness's credibility. State v. Lee, 188 Wn.2d 473, 488, 396 P.3d 316 (2017). Credibility evidence is particularly relevant when a witness is central to the prosecution's case. Id. "Relevant credibility evidence may include specific instances of lying, though their admission is highly

---

[4] https://www.courts.wa.gov/opinions/pdf/993378.pdf.

discretionary under ER 608(b)." Id. (quotations omitted). But "evidence of a witness'[s] prior false statement is not always relevant, particularly when that evidence is unrelated to the issues in the case." Id. at 489. Evidence generally intended to paint a picture of a witness as untrustworthy is less probative than evidence establishing a witness's bias or motive to lie in a particular case. Id. Washington courts typically disfavor evidence intended to suggest that because a person lied in the past, they must be lying now. Id. at 490 (citing ER 404(b)).

The trial court had a tenable basis for excluding the evidence here. First, it did not establish that Detective Fontenot had a motive to lie in Williams's case and Williams did not allege he had done so. Second, it did not cast doubt on the chain of custody of any specific piece of the State's evidence and Williams did not allege that Detective Fontenot mishandled evidence here. Third, the evidence was fairly dated, describing events that occurred 15 years earlier. The court did not abuse its discretion in deciding the evidence had low probative value.

Williams cites State v. York, 28 Wn. App. 33, 621 P.2d 784 (1980), in which Division Three reversed York's conviction for two counts of delivery of a controlled substance concluding the trial court erred in precluding him from introducing evidence regarding prior misconduct on behalf of the undercover investigator who arrested him after a controlled sale of marijuana. But York is distinguishable. In that case, the testimony of the investigator, Smith, was vital to the prosecution's case. Division Three reasoned:

> [t]he importance of Smith's testimony cannot be overstated. He was the only witness to have allegedly seen York sell the marijuana. . . .
>
> His credibility, based on his apparent unsullied background and the total lack of meaningful impeachment, was stressed heavily by the

prosecution. In short, his credibility was crucial to the state and to the defense; it was simply a contest between the word of Gary Smith and Kineth York's alibi witnesses.

Id. at 35. The court concluded, "as a matter of fundamental fairness, the defense should have been allowed to bring out the only negative characteristics of the one most important witness against York." Id. at 37.

In stark contrast to York, although Detective Fontenot was the lead investigator in this case, he was not a witness to the alleged crime, and his testimony was not the most important piece of the prosecution's case. The State did not rely on Detective Fontenot to provide any direct evidence of Williams's actions on the night of the shooting. Instead, the State called Naylor, Williams's accomplice, who described in detail the plan to rob Clute, the trip to and from the car wash, Williams's act of shooting Clute, and Williams's disposal of the clothing he wore during the attempted robbery. Amy Chavez testified about calling Clute to set up an ostensible drug buy and Naylor's request that she pick him and Williams up from the neighborhood where they abandoned the PT Cruiser. Clute testified and gave his account of the shooting and attempted robbery, which was consistent with the plan Naylor described. Finally, video footage from the car wash and from the residential neighborhood where the PT Cruiser was found corroborated each eyewitness's account.

Because Detective Fontenot was not a crucial witness and the excluded testimony was not directly related to the case at hand, the trial court did not abuse its discretion in precluding cross examination of the impeachment materials.

2. Williams's right to present a defense

Williams contends that even if the court did not abuse its discretion in excluding the evidence under ER 608(b), its decision nevertheless prevented him from presenting a defense. We conclude that, if error occurred, the exclusion of this evidence was harmless.

Both the federal and state constitutions protect the rights of criminal defendants to present a complete defense and to confront adverse witnesses. U.S. CONST. amend. VI; WASH CONST. art. I, § 22; Davis v. Alaska, 415 U.S. 308, 316, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974); State v. Jones, 168 Wn.2d 713, 720, 230 P.3d 576 (2010). "The primary and most important component" of the confrontation right "is the right to conduct a meaningful cross-examination of adverse witnesses." State v. Darden, 145 Wn.2d 612, 620, 41 P.3d 1189 (2002). Neither the right to confront nor the right to present a defense are without limitation. Darden, 145 Wn.2d at 621. For example, "the Constitution permits judges to exclude evidence that is repetitive . . . , only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues." Holmes v. South Carolina, 547 U.S. 319, 326-27, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006) (quotations omitted).

In assessing whether the exclusion of evidence violates a defendant's right to present a defense, we ask: "(1) whether the excluded evidence was at least minimally relevant, (2) whether the evidence was 'so prejudicial as to disrupt the fairness of the factfinding process at trial,' and, if so, (3) whether the State's interest in excluding the prejudicial evidence outweighs the defendant's need to present it."

State v. Orn, 197 Wn.2d 343, 353, 482 P.3d 913 (2021) (quoting State v. Hudlow, 99 Wn.2d 1, 15, 659 P.2d 514 (1983)).

While Orn held that a witness's bias is always relevant because it affects the weight of their testimony, 197 Wn.2d at 353, Lee held that the fact that a witness testified untruthfully in the past is not always relevant to assess that witness's credibility in the trial at hand. 188 Wn.2d at 489. Defense counsel argued below that evidence of Detective Fontenot's mishandling of evidence in prior cases "would support [Fontenot's] lack of veracity in regards to his procedures." But Williams did not challenge the veracity of the detective's testimony as to how he handled evidence in this case. And we fail to see the connection between the prior negligent handing of evidence and a witness's character for truthfulness. It appears that the only actual purpose Williams had for offering this evidence was to make an improper propensity argument—that if Detective Fontenot lied in the past, he must be untruthful now.

But even if we assume that the incidents leading to Detective Fontenot's resignation from the Clallam County Sheriff's Office in 2005 were minimally relevant and that Williams's need for this evidence outweighed the prejudice to the State in having to respond to such propensity evidence, we nonetheless conclude the trial court's exclusion was harmless beyond a reasonable doubt.

The exclusion of relevant and nonprejudicial evidence constituting a violation of a defendant's Sixth Amendment right to present a defense is subject to constitutional error analysis. Orn, 197 Wn.2d at 359. A constitutional error is harmless and not grounds for reversal if the State shows beyond a reasonable

doubt that the jury would have reached the same verdict without the error. State v. Romero-Ochoa, 193 Wn.2d 341, 347, 440 P.3d 994 (2019). Where impeachment evidence has been erroneously excluded, the correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, we can nonetheless say that the error was harmless beyond a reasonable doubt. Orn, 197 Wn.2d at 359 (quotations omitted). We must find the error harmless if, in light of the entire trial record, we are convinced that the jury would have reached the same verdict absent the error. Id. (quotations omitted).

Williams argues that the error was not harmless because this court "cannot speculate whether the jury would have weighed a witness's testimony differently had proper cross-examination as well as extrinsic impeaching evidence been allowed." But Williams's defense at trial was that he was not the shooter and that Naylor lied about his involvement. Even if the jury had found Detective Fontenot to lack any credibility at all, Naylor's and Chavez's testimony, the security camera footage that captured the shooting, the DNA evidence linking Williams to the abandoned clothing, and the rare purple shell casing recovered at the scene and its matching bullets found in Williams's possession—evidence completely unrelated to the credibility of Detective Fontenot's testimony—demonstrated beyond a reasonable doubt that Williams was the shooter. We therefore reject Williams's Sixth Amendment claim.

D.    Community Custody Fee

Finally, Williams argues the trial court erred in imposing a community custody fee in Williams's judgment and sentence. We agree.

At sentencing, the trial court clearly stated orally that it intended to waive all discretionary legal financial obligations (LFOs). Williams's judgment and sentence mistakenly includes a discretionary community custody fee. The inclusion of this fee was procedural error and it must be stricken. See State v. Bowman, 198 Wn.2d 609, 629, 498 P.3d 478 (2021) (when trial court clearly intends to impose only mandatory LFOs, community custody supervision fee should be stricken as procedural error).

We affirm Williams's convictions but remand for the trial court to strike the DOC supervision fee from his judgment and sentence.

_Andrus, C.J._

WE CONCUR:

_Coburn, J._      _Bowman, J._